IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
Newark Vicinage

| | |
|---|---|
| ELSID ALIAJ,<br><br>        Plaintiff,<br><br>-against-<br><br>FORT LEE POLICE DEPARTMENT, MATTHEW J. HINTZE, in his official capacity as Chief of FORT LEE POLICE DEPARTMENT, BERGEN COUNTY PROSECUTOR'S OFFICE, and MARK MUSELLA, in his official capacity as Bergen County Prosecutor,<br><br>        Defendants. | Case No. 2:25-cv-17131<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, ELSID ALIAJ ("Aliaj" or "Plaintiff"), by and through his attorneys, Taylor Dykema PLLC, brings this action against FORT LEE POLICE DEPARTMENT ("FLPD"), MATTHEW J. HINTZE, in his official capacity as Chief of FORT LEE POLICE DEPARTMENT, BERGEN COUNTY PROSECUTOR'S OFFICE ("BCPO"), and MARK MUSELLA, in his official capacity as Bergen County Prosecutor (together, "Defendants"), and alleges as follows:

**INTRODUCTION**

1.    This action arises under the Second Amendment to the U.S. Constitution (U.S. CONST. amend. II).

2.    Put simply: Defendants have taken the position that an individual can be prohibited from exercising their fundamental rights under the Second Amendment *by association* if their spouse is so prohibited. This is not the law.

1

3. On April 17, 2025, FLPD—based on a report from the Englewood Police Department ("EPD") that Aliaj's wife (hereinafter referred to as "L.A.") had been involuntarily admitted to New Bridge Medical Center for a mental health evaluation (in what turned out to be a language-related misunderstanding, resulting in L.A.'s discharge with a diagnosis of "Adjustment disorder with depressed mood Seven weeks pregnant")—confiscated Aliaj's firearms, ammunition, and related accessories from his home.

4. At present, FLPD and BCPO continue to illegally deprive Aliaj of his constitutionally protected property, even though Aliaj is not under any legal, mental, or physical disability that would disqualify him from exercising his fundamental right to keep and bear arms.

5. Moreover, on September 12, 2025, BCPO commenced a proceeding to revoke Aliaj's Firearms Purchaser Identification Card ("FPIC"), with the intention of converting the confiscation and deprivation of his property into a permanent loss of Second Amendment rights (the "Revocation Proceeding").

6. Defendants are illegally imputing L.A.'s perceived mental disability to Aliaj to deprive him of his Second Amendment rights, even though he is under no disability and subject to no disqualifying factor. This Defendants may not do, *full stop*.

7. Accordingly, Aliaj faces imminent irreparable harm, and brings this action for declaratory and injunctive relief to vindicate his fundamental right to keep and bear arms under the Second Amendment.

## PARTIES

8. Plaintiff Aliaj is a 38-year-old natural person, United States citizen, and a citizen of the State of New Jersey residing in Fort Lee, Bergen County. Aliaj is a peaceable, law-abiding citizen who is not disqualified in any way from ownership, possession, and use of firearms.

9. Defendant FLPD is a police department existing under the laws of the State of New Jersey and with law enforcement jurisdiction in Fort Lee.

10. Defendant Matthew J. Hintze is the current Chief of FLPD.

11. Defendant BCPO is a law enforcement office existing under the laws of the State of New Jersey and with law enforcement and prosecutorial jurisdiction in Bergen County, including Fort Lee.

12. Defendant Mark Musella is the chief prosecutor in Bergen County as head of BCPO.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343, which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights and privileges provided for under the U.S. Constitution.

14. This action, based on violations of Plaintiff's constitutional rights, is brought under 42 U.S.C. § 1983 and seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and damages, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

15. Due to the ongoing and imminent harm caused by the confiscation and deprivation of Plaintiff's property, there is an actual and justiciable controversy between the parties necessitating declaratory relief.

16. This Court has personal jurisdiction over the Defendants since they are situated within the District of New Jersey.

17. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants are citizens of the State of New Jersey, where the District of New Jersey is located; or,

alternatively, under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### I. The Confiscation of Aliaj's Firearms

18. On April 17, 2025, L.A. was involved in a misunderstanding at a medical clinic in Englewood, New Jersey which caused the provider to mistakenly believe that she wanted to harm herself. Clinic personnel then called the Englewood Police Department, which in turn involuntarily admitted L.A. to New Bridge Medical Center.

19. In fact, as was ultimately confirmed by her medical providers, L.A. did not want to harm herself and was not a threat to herself or others.

20. Notwithstanding this misunderstanding, later that evening, at about 8:45 p.m., Police Officer Iacovo of the Englewood Police Department contacted FLPD headquarters and advised that the Englewood Police Department had taken L.A. to New Bridge Medical Center and had conducted a computer search of Aliaj's registered firearms.

21. At approximately 9:30 p.m., Detective Sergeant D. Tropea and Police Officer J. Perez of FLPD arrived at Aliaj's home, where he and L.A. reside together.

22. L.A. does not now, and has never, owned any firearms.

23. Sergeant Tropea and Officer Perez, without presenting any warrant or other court order, instructed Aliaj to surrender his firearms because of L.A.'s involuntary admission.

24. Although bewildered by this sudden and illegal demand, Aliaj, believing he would be arrested if he did not comply, had no choice but to cooperate. Accordingly, he surrendered the following firearms, ammunition, and related accessories to Sergeant Tropea and Officer Perez: (a) black Smith & Wesson M&P 15 (rifle), equipped with a Holosun HM3X magnifier and a Sig Sauer

RomeoX sight, (b) black Springfield Armory XD (handgun), (c) metallic grey Springfield Armory 9mm (handgun), (d) one Springfield Armory ten-round handgun magazine, (e) three Magpul ten-round rifle magazines. (5.56/.223), (f) two boxes of Hornady Critical Defense 9mm ammunition, 115 grain bullets (25-count each), and (g) one box of Winchester 5.56, 55 grain FMJ (200-count) (collectively, the "Seized Property").

25. Several days later, on April 21, 2025, L.A. was discharged with a diagnosis of "Adjustment disorder with depressed mood" and a note that she was "Seven weeks pregnant."

26. Moreover, L.A.'s medical records contain the following notation under an entry entitled "Hospital Course": "As patient's acute symptoms resolved since admission *she was not presenting acutely anxious depressed suicidal or psychotic she did not meet the criteria for continued inpatient psychiatric hospitalization* and was discharged back to the care of husband . . . ." (Emphasis added).

27. Additionally, a notation under an entry entitled "Suicidal and Self Injurious Behavior" states:

> ACTUAL SUICIDE ATTEMPT: None reported; INTERRUPTED SUICIDE ATTEMPT: None reported; ABORTED OR SELF-INTERRUPTED ATTEMPT: None reported; OTHER PREPARATORY ACTS TO KILL SELF: None reported; SELF-INJURIOUS BEHAVIOR WITHOUT SUICIDAL INTENT: None reported.

II. **The Continuing Deprivation of Rights and the Revocation Proceeding**

28. Since his firearms, ammunition, and related accessories were improperly confiscated, FLPD, aided by BCPO, has maintained continuous possession of the Seized Property.

29. Aliaj has a Metallitrend brand gun safe which is 57 inches tall, has anti-theft technology, and can only be opened using a passcode, biometric input, or a key.

30. Aliaj has not shared the passcode or key to the safe with L.A., and only his biometric input is recognized by the safe.

31. Aliaj intends to immediately lock his firearms in his gun safe upon their return to him, restricting access to anyone besides himself.

32. On April 26, 2025, Aliaj emailed Amy West ("West"), a Paralegal Specialist at BCPO, and wrote: "Hi Amy, Fort Lee Police told me to contact you for returning my firearms. Please advise."

33. On April 28, 2025, West replied:

> Morning! Since your wife was committed to New Bridge Medical Center, the Bergen County Prosecutor's office will not agree to the firearms being returned to your home. The options available to you are to store in an offsite firearm storage facility, sell the firearms, destroy the firearms, or have a hearing to try and have the firearms returned to your home. Please let me know what you would like to do and we will go from there.

34. In a reply email the same day, Aliaj initially indicated he would try a hearing. However, West quickly informed Aliaj: "OK just so that you are aware, a hearing will not be until about September or later."

35. As the email exchange continued to April 28, 2025, Aliaj, without the benefit of counsel, initially did not object to the lengthy delay for a hearing and inquired about the option to sell his firearms, before again selecting the hearing option in a subsequent email. However, troubled by the unreasonableness of the contemplated process, he astutely asked: "[W]hy is the hearing so far out I thought this was a temporary thing and hearings are supposed to happen within some short time limit?" West unhelpfully offered that "[w]e have a lot of cases and the Courts are backed up with hearings/trials."

36.     A month later, on May 28, 2025, Aliaj wrote: "Amy, Are there any reports that I can get for this? Nobody has given me anything. Is there an ERPO or TERPO for this? Can you provide a copy?" That same day, West replied: "There is no ERPO. Your weapons were seized as stated in the original email to you. Paperwork will be supplied when the motion is filed to have the hearing."

37.     At this point, Aliaj, having reflected further, now understood that he was facing an obvious ongoing violation of his constitutional rights. He replied: "Hi Amy thanks for the prompt response. Is there a TERPO? Under what legal statute [sic], grounds, procedure were they confiscated?

38.     West replied: "The Police should have explained this at the time of the seizure. This falls under the duty to warn law because your wife was involuntarily committed. There is no ERPO."

39.     N.J.S.A. 2A:62A-16.1.e, which is part of the so-called "duty to warn" statute, provides, in relevant part, "[a] firearm surrendered or seized pursuant to this subsection which is not legally owned by the patient shall be *immediately* returned to the legal owner of the firearm if the legal owner submits a written request to the prosecutor attesting that the patient does not have access to the firearm." (Emphasis added).

40.     As the Seized Property was legally owned by Aliaj, not L.A., Aliaj sought to utilize this statutory provision which exists to provide a mechanism whereby a disarmed individual could expeditiously recover their firearms which were confiscated due to another individual triggering the duty to warn law.

41.     Accordingly, on June 23, 2025, Aliaj emailed West a demand pursuant to N.J.S.A. 2A:62A-16.1.e, informing BCPO of his gun safe, which L.A. did not have access to, and requesting

the immediate return of his firearms and ammunition, which, upon their return, would be securely stored in said safe. Aliaj wrote:

> On the advice of counsel, I formally submit the following statement:
>
> NJ Rev Stat § 2A:62A-16, subsection (e), states in relevant part, "A firearm surrendered or seized pursuant to this subsection which is not legally owned by the patient shall be immediately returned to the legal owner of the firearm if the legal owner submits a written request to the prosecutor attesting that the patient does not have access to the firearm."
>
> I hereby attest that, 1) the firearms I keep in my home will be stored in a locked, metallic, fireproof safe which my wife, [L.A.], cannot access, 2) when locked, the means to enter the safe are under my constant control, and 3) the firearms in question are only removed by me and remain under my control when not locked in the safe.
>
> I hereby request the immediate return of my property as described in the attached report submitted by P.O. Iacovo of the Fort Lee Police Department on April 17, 2025 (Incident #I-2025-021729) to include:
>
> One (1) black Smith & Wesson M&P (Serial Number TW51695), equipped with a Holosun HM3X and Sig Sauer RomeoX
>
> One (1) black Springfield Armory XD (Serial Number: BF432419)
>
> One (1) metallic grey Springfield Armory 9mm, 10-round magazine
>
> Three (3) Magpul 10-round rifle magazine (5.56x45 NATO/.223 Remington)
>
> Two (2) boxes of Hornady Critical Defense 9mm, 115 grain bullets (25-count each)
>
> One (1) box of Winchester 5.56mm M193, 55 grain FMJ (200-count)
>
> Best,
>
> Elsid

42.     Although the statute does not provide any discretion to reject such a request, BCPO ignored Aliaj. When no response was forthcoming, and fully aware that Defendants were violating his rights, Aliaj emailed West on June 26, 2025, and asked, "when I can arrange to come pick up

my property." West replied: "I have received all your emails, and the case is still pending. You cannot pick up anything at this time."

43. Aliaj's fruitless and futile communications with BCPO continued into July, at this point with Assistant Prosecutor David Aguirre ("Aguirre"), who insisted that Aliaj provide L.A.'s medical records so that BCPO could determine that she was not a danger. By email dated July 17, 2025, Aguirre wrote, *inter alia*:

> With the records we will be able to determine if she is a danger to herself or the community. If we determine that she is not a danger, then we may be able to resolve the matter without filing motions. If you are not amenable to this option, I will be filing a motion to revoke your FPIC and a motion for your wife's medical records . . . . please let me know asap.

44. On July 23, 2025, faced with Aguirre's illegal threats, Aliaj initially agreed to provide L.A.'s medical records.

45. However, after consulting with counsel, Aliaj realized that he was legally entitled to the return of the Seized Property irrespective of the contents of L.A.'s medical records, and that Aguirre had no legal basis to condition the *possible* return of the Seized Property on Aliaj's furnishing of L.A.'s medical records. Accordingly, Aliaj decided not to provide the medical records in the face of Aguirre's coercion.

46. Further discussion between undersigned counsel and BCPO only further confirmed that Defendants have no basis in statutory or case law to continue the Deprivation.

47. On September 11, 2025, undersigned counsel emailed Aguirre and inquired, *inter alia*:

> Can you please provide me with the statutory or case authority you are invoking, or intend to rely on, to require Mr. Aliaj to furnish his wife's medical records in exchange for getting his constitutionally protected property returned promptly? There is no ERPO/TERPO here, and I've reviewed the "duty to warn" law, which in no way contemplates any such requirement for a family member or cohabitant

who is not disqualified from firearms ownership/possession--such as Mr. Aliaj. Thank you.

48. Aguirre replied:

Prior to Mr. Aliaj hiring you I spoke candidly with him and told him that the basis of the pending motion to revoke is that *the State has concerns about weapons being present in the home when his wife is making statements about wanting to hurt herself and is schizophrenic/bipolar*. In our conversations Mr. Aliaj advised that Bergen New Bridge cleared her and deemed she was not a threat to herself or anyone else. I told Mr. Aliaj that if I could get her medical records to substantiate his claim, the State's concerns may be assuaged.

(Emphasis added).

49. Aguirre's response was telling—he was unable to invoke any legal authority for confiscating Aliaj's firearms; nor could he, because there is no such authority. The only "authority" that he could concoct was the "State's concerns"—which is not a legally recognized basis to confiscate and retain a citizen's firearms and ammunition, nor to revoke a FPIC.

50. Undersigned counsel continued to press Aguirre for a legal citation in further email and verbal communications.

51. However, rather than continuing to discuss the situation in good faith, Aguirre simply commenced the Revocation Proceeding without warning the next day, September 12, 2025, without explanation.

52. In the Revocation Proceeding, BCPO seeks not only to revoke Aliaj's FPIC, but to compel the production of L.A.'s mental health and psychiatric records and to compel the sale of Aliaj's firearms.

53. BCPO has no legal authority to ransom Aliaj's firearms and ammunition in exchange for intrusion into L.A.'s private medical affairs, not was Aliaj legally required to comply with such a demand.

10

54. Nonetheless, Aliaj faces the ongoing deprivation and violation of his constitutional right to bear arms, and, when he challenged that deprivation and violation, he was retaliated against with the Revocation Proceeding.

### III. Relevant New Jersey Laws

55. As referenced *supra*, New Jersey has a duty to warn law, codified at N.J.S.A. 2A:62A-16, which was invoked by both FLPD and BCPO in connection with the confiscation of the Seized Property and the ongoing deprivation of same.

56. Under the duty to warn law, health care professionals have a "duty to warn and protect" where a patient has communicated "a threat of imminent, serious physical violence against a readily identifiable individual or against himself" or where the practitioner believes that "the patient intended to carry out an act of imminent, serious physical violence against a readily identifiable individual or against himself." N.J.S.A. 2A:62A-16.1.b(1), (2).

57. Practitioners are also required, where applicable, to notify law enforcement of such imminent danger, including the identity of the patient.

58. In addition, the patient can be compelled to surrender his or her firearms, under the following circumstances:

> If *the patient* has been issued a firearms purchaser identification card, permit to purchase a handgun, or any other permit or license authorizing possession of a firearm, or if there is information indicating that *the patient* otherwise may have access to a firearm, the information provided may be used in determining whether *the patient* has become subject to any of the disabilities set forth in subsection c. of N.J.S.2C:58-3. If the chief law enforcement officer or superintendent, as appropriate, determines that *the patient* has become subject to any of the disabilities set forth in subsection c. of N.J.S.2C:58-3, any identification card or permit issued to the patient shall be void and subject to revocation by the Superior Court in accordance with the procedure established in subsection f. of N.J.S.2C:58-3.
>
> N.J.S.A. 2A:62A-16.1.e. (Emphasis added).

59. With respect to seizure of firearms, the duty to warn law only applies to the patient who is the subject of the report and the firearms they have access to, but it does *not* apply to the firearms of family members or co-habitants which the patient does not have access to. Moreover, the surrender of firearms under the duty to warn law requires a court order.

60. Since Aliaj was not the subject of any "duty to warn" report, he was not legally subject to seizure of his firearms, ammunition, and related accessories—the Seized Property.

61. Moreover, even if, *arguendo*, the initial confiscation of the Seized Property was proper, Defendants' failure to return the Seized Property is a violation of the duty to warn statute which provides "[a] firearm surrendered or seized pursuant to this subsection which is not legally owned by the patient *shall be immediately returned to the legal owner* of the firearm if the legal owner submits a written request to the prosecutor attesting that the patient does not have access to the firearm." (Emphasis added).

62. In addition to the duty to warn law, New Jersey is one of the minority of states that has a so-called "red flag law," pursuant to which a civil court, upon commencement petition by a law enforcement officer or private citizen, can petition for the issuance of a warrant (a) directing the respondent named in the petition to immediately surrender to law enforcement all firearms and ammunition owned or otherwise possessed by the respondent, and (b) prohibiting the respondent from purchasing or possessing firearms or ammunition for a prescribed period of time.

63. New Jersey's red flag law, known as the Extreme Risk Protective Order Act of 2018 (the "ERPO Act"), is codified at N.J.S.A. 2C:58-20-32.

64. Under the ERPO Act, firearms and ammunition are confiscated pursuant to Extreme Risk Protective Orders (ERPO) or Temporary Extreme Risk Protective Orders (TERPO).

65. At no time have Aliaj or L.A. been the subject of an ERPO or a TERPO. Neither FLPD, BCPO, or any private citizen filed a petition against them pursuant to the ERPO Act.

66. Yet, BCPO invokes the "State's concerns" and relies on the following inapplicable statutes to sustain the Revocation Proceeding: (a) <u>N.J.S.A</u>. 2C:58-3(c)(3), which prohibits the issuance of an FPIC or permit to purchase a handgun to "any person who suffers from physical defect or disease which would make it unsafe for that person to handle firearms, to any person with a substance use disorder unless any of the foregoing persons produces a certificate of a medical doctor, treatment provider, or psychiatrist licensed in New Jersey, or other satisfactory proof, that the person no longer has that particular disability in a manner that would interfere with or handicap that person in the handling of firearms"; (b) <u>N.J.S.A.</u> 2C:58-3(c)(5), which prohibits the issuance of an FPIC to "any person where the issuance would not be in the interest of the public health, safety, or welfare because the person is found to be lacking the essential character of temperament necessary to be entrusted with a firearm"; (c) <u>N.J.S.A.</u> 2C:58-3(c)(13) prohibits issuance of an FPIC to any person that has been voluntarily admitted to inpatient treatment or involuntarily committed to inpatient or outpatient treatment, unless the court has expunged the person's record.

## **CLAIM FOR RELIEF**

**COUNT ONE**
**Violation of the United States Constitution**
**Second & Fourteenth Amendments**
**(42 U.S.C. § 1983)**
**(Plaintiff v. All Defendants)**

67. Plaintiff repeats, realleges, and incorporates by reference every allegation of the foregoing paragraphs as if fully set forth in each claim for relief.

13

68. Plaintiff brings his claim pursuant to 42 U.S.C. § 1983, which provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights . . . . secured by the Constitution and laws [of the United States], shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

69. The Second Amendment to the U.S. Constitution provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. CONST. amend. II.

70. Incorporated against the states through the Due Process Clause of the Fourteenth Amendment (U.S. CONST. amend. XIV, § 1), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Second Amendment guarantees "an individual right to keep and bear arms," *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). It is "a fundamental constitutional right guaranteed to the people," *id.*, which is and has always been key to "our scheme of ordered liberty." *McDonald*, 561 U.S. at 767-68.

71. "*Heller* . . . demands a test rooted in the Second Amendment's text, as informed by history." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 19 (2022) (citing *Heller*, 554 U.S. 570). Consistent with this demand, and because "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms," *Heller*, 554 U.S. at 582, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.

72. Here, as a threshold matter, FLPD and BCPO are unquestionably governmental entities and the individual Defendants are unquestionably governmental actors, all subject to the Second Amendment.

14

73. Therefore, since Defendants are subject to the Second Amendment, the only other question is whether their conduct violated the Second Amendment. Applying the historical and textual test that *Heller* and *Bruen* require, the answer to this question is undoubtedly yes.

74. Plaintiff's right to keep and bear arms was infringed when Defendants unlawfully seized his constitutionally protected firearms, ammunition, and related items, refused to return them pursuant to New Jersey statutory requirements, and then proceeded to extend what should have been at most a temporary constitutional infringement into a potentially permanent one by instigating the retaliatory Revocation Proceeding.

75. As a result, Aliaj has been completely barred from exercising his fundamental right to keep and bear arms, including handguns, in his "*home*, where the need for defense of self, family, and property is *most acute*." *Heller*, 554 U.S. at 628 (emphases added). The Revocation Proceeding will only turn this *ultra vires* act into a permanent loss of rights.

76. This is not a close case. Rather, Defendants have blatantly thumbed their nose at the clear precedent of the Supreme Court of the United States and will continue to do so absent court intervention. A governmental entity simply may not prevent a peaceable, law-abiding individual from possessing handguns and other firearms in the home, *full stop*. *See Heller*, 554 U.S. at 576, 635-636 (holding that the District of Columbia's "total ban on handguns, as well as its requirement that firearms in the *home* be kept nonfunctional even when necessary for self-defense" violated the Second Amendment) (emphasis added); *Id*. at 627 ("As we have said, the law totally bans handgun possession in the *home*.") (emphasis added).

77. Indeed, the Second Amendment "takes certain policy choices off the table [including] the absolute prohibition of *handguns* held and used for self-defense in the home." *Heller*, 554 U.S. at 636. (Emphasis added). As Defendants should know, "the American people

have considered the handgun to be the quintessential self-defense weapon" and "handguns are the most popular weapon chosen by Americans for self-defense in the home." *Id*. at 629. Among Aliaj's Seized Property were two handguns.

78. The State of New Jersey can't bar Aliaj from safely possessing handguns and other firearms in his home and neither can Defendants, regardless of the purported mental condition of family members and cohabitants.

79. When it comes to the home, banning peaceable, law-abiding citizens such as Aliaj from possessing firearms in this sacrosanct location is a policy choice that is "off the table."

80. It is beyond cavil that there is *no* historical tradition of prohibiting peaceable, law-abiding citizens such as Aliaj from possessing firearms in their homes. Therefore, Defendants cannot make an affirmative showing that any of their unlawful acts regarding Aliaj's firearms are part of any historical tradition of firearms regulation.

81. The ongoing constitutional violations and the Revocation Proceeding lack any constitutional, statutory, or regulatory basis. These infringements are nothing more than Defendants' ideological policy preferences.

82. Defendants having deprived Aliaj of the Seized Property, and maintaining the Revocation Proceeding, were undertaken intentionally and while acting under color of state law. In so doing, Defendants have deprived and continue to deprive Aliaj of his fundamental constitutional right to keep and bear arms in his home, entirely inconsistent with any historic tradition of firearms regulation, and Aliaj has consequently been damaged and will be irreparably harmed each day that the Seized Property is withheld from him and the Revocation Proceeding is allowed to continue.

83. These violations inflict irreparable harm on Aliaj. He has a substantial likelihood of success on the merits of his claim under the Second and Fourteenth Amendments, lacks an adequate remedy at law for this infringement on his fundamental right to keep and bear arms, and the harm that Aliaj would suffer from denial of an injunction exceeds any legally cognizable harm an injunction may inflict upon Defendants. The public interest favors enjoining both Defendants' deprivation of Aliaj's Second Amendment rights and enjoining the Revocation Proceeding, requiring that Defendants return the Seized Property to Aliaj, and further enjoining Defendants from taking any action to revoke Aliaj's FPIC.

84. As a direct and proximate result of the above violations of Aliaj's rights protected under the Second and Fourteenth Amendments, Aliaj has suffered an unlawful deprivation of his fundamental constitutional right to keep and bear arms, and he will continue to suffer such an injury until granted the relief sought herein.

85. Accordingly, Aliaj is entitled to injunctive relief in the form of a preliminary injunction, and ultimately a permanent injunction, enjoining Defendants from destroying, selling, transferring, or otherwise disposing of the Seized Property; enjoining Defendants from continuing and maintaining their unlawful possession of the Seized Property, and thus requiring that Defendants immediately return the Seized Property to Aliaj; and enjoining the Revocation Proceeding and further enjoining Defendants from taking any action to revoke Aliaj's FPIC, all to protect Aliaj against the irreparable harm of ongoing deprivation of his Second Amendment rights.

86. Aliaj is also entitled to a declaration that Defendants' continued confiscation and deprivation of the Seized Property, and maintenance of the Revocation Proceeding, violate his Second Amendment rights, and a further declaration that N.J.S.A. 2C:58-3(c)(3), N.J.S.A. 2C:58-3(c)(5), and N.J.S.A. 2C:58-3(c)(13) are each unconstitutional as applied to Aliaj.

87. As well, Aliaj is entitled to his attorneys' fees and costs associated with this action.

## JURY DEMAND

88. Plaintiff, Elsid Aliaj, hereby demands trial by jury.

**WHEREFORE**, Plaintiff, Elsid Aliaj, demands judgment against the Defendants as follows:

(a) On Count One, declaratory relief as set forth in this Complaint.

(b) On Count One, injunctive relief as set forth in this Complaint;

(c) On Count One, Plaintiff's attorneys' fees and costs associated with this action pursuant to 42 U.S.C. § 1988; and

(d) Any other and further relief as the Court deems just and proper.

Dated: November 3, 2025

Respectfully submitted,

*/s/Edward Andrew Paltzik*
Edward Andrew Paltzik
(Bar No. 251582017)
**Taylor Dykema PLLC**
914 E. 25th Street
Houston, TX 77009
Tel: 516-526-0341
edward@taylordykema.com

*Attorneys for Plaintiff*