**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ELSID ALIAJ, MARTIN HRONCICH, and LUIS RENE DE LA CRUZ FRANCO,<br>　　　　　Plaintiffs,<br><br>　　　　　v.<br>BERGEN COUNTY PROSECUTOR'S OFFICE, MARK MUSELLA, in his official capacity as Bergen County Prosecutor, BOROUGH OF FORT LEE, BOROUGH OF PARAMUS, and TOWNSHIP OF ROCHELLE PARK,<br><br><br>　　　　　Defendants. | CIVIL ACTION NO. 2:25-cv-17131-ES-MAH<br><br>Civil Action<br><br>Motion Date: August 17, 2026 |

---

**BRIEF IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT**

---

**CLEARY GIACOBBE ALFIERI JACOBS, LLC**
Attorneys for Defendant Borough of Fort Lee
169 Ramapo Valley Road, UL-105
Oakland, New Jersey 07436

On the Brief and Of Counsel:

　　Mary Anne Groh, Esq. (Atty. No. 030531993)

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

PRELIMINARY STATEMENT ............................................................................ 1

LEGAL ARGUMENT ....................................................................................... 2

    POINT I ...................................................................................................... 2

    THE CLAIMS IN COUNT ONE OF THE FAC FAIL TO STATE CLAIMS UPON WHICH RELIEF CAN BE GRANTED AGAINST FORT LEE AND SHOULD BE DISMISSED............................................................................................... 2

        A.    Standards Governing A Motion To Dismiss Under Fed.R.Civ.P. 12(b)(6)............................................................................................ 2

        B.    Mr. Aliaj Has Not Pled A Viable Claim For Damages Against Fort Lee Under Section 1983. ............................................................ 3

        C.    Fort Lee Is Immune From Liability For Any Claim By Mr. Aliaj Based On Fort Lee's Enforcement Of The Challenged Policies. ...... 9

CONCLUSION ............................................................................................. 12

## TABLE OF AUTHORITIES

**Page**

**Cases**

Albright v. Oliver, 510 U.S. 266 (1994) ........................................................ 4

Anderson v. Creighton, 483 U.S. 635 (1987)................................................. 10

Andrews v. City of Philadelphia, 895 F.2d 1469 (3d Cir. 1990)........................ 9

Ashcroft v. Iqbal, 556 U.S. 662 (2009) ......................................................... 3

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) ........................................... 3

Bulur v. New Jersey Off. of Att'y Gen., 480 N.J. Super. 395
  (App. Div. 2024), rev'd on other grounds, 261 N.J. 275 (2025) .................... 12

Gerofsky v. Passaic County SPCA, 376 N.J.Super. 405 (App. Div. 2005) ........ 12

Gurski v. New Jersey State Police Dept., 242 N.J. Super. 148 (1990) ............. 10

Kirk v. City of Newark, 109 N.J. 173 (1988)................................................. 10

Konigsberg v. State Bar of Cal., 366 U.S. 36, 50 (1961) ................................. 5

Monell v. Department of Social Services, 436 U.S. 658 (1978)......................... 9

Morse v. Lower Merion Sch. Dist., 132 F.3d 902 (3d Cir. 1997)....................... 3

New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1 (2022).. 4, 5

Nicini v. Morra, 212 F.3d 798 (3d Cir. 2000).................................................. 4

Passaic Cnty. PBA Loc. 197 v. Off. of Passaic Cnty. Prosecutor,
  385 N.J. Super. 11 (App. Div. 2006) ....................................................... 12

Phillips v. County of Allegheny, 515 F.3d 224 (3d Cir. 2008)........................... 3

Port Auth. of N.Y. and N.J. v. Arcadian Corp., 189 F.3d 305 (3d Cir. 1999)...... 2

Schneider v. Simonini, 163 N.J. 336, cert. denied, 531 U.S. 1146,
  121 S.Ct. 1083, 148 L.Ed.2d 959 (2001) ................................................. 11

Simmons v. Loose, 418 N.J. Super. 206 (App. Div. 2011)............................... 11

State v. Winne, 12 N.J. 152 (1953) ............................................................. 12

Warth v. Seldia, 422 U.S. 490 (1975)............................................................ 3

Wright v. State, 169 N.J. 422 (2001)........................................................... 10


**Constitution**

Second Amendment of the United States Constitution.............................. 1, 4


**Statutes**

42 U.S.C. § 1983 ....................................................................... 1, 4, 9, 10, 11

N.J.S.A. 59:1–1, et seq. ............................................................................ 10

N.J.S.A. 59:3–3 ....................................................................................... 10


**Rules**

Fed.R.Civ.P. 12(b)(6)............................................................................ 2, 12


**Treatises**

Pressler, Current N.J. Court Rules, comment 17.1 on R. 4:5–4 (2001) .......... 10

## PRELIMINARY STATEMENT

Plaintiff Elsid Aliaj ("Mr. Aliaj") initiated this action by filing a complaint on November 3, 2025 against the Fort Lee Police Department; Matthew J. Hintze, in his official capacity as Chief of Fort Lee Police Department; Bergen County Prosecutor's Office ("BCPO"); and Mark Musella, in his official capacity as Bergen County Prosecutor ("Bergen County Prosecutor") (BCPO and Bergen County Prosecutor are collectively referred to herein at times as "County Defendants") alleging that firearms owned by Mr. Aliaj were wrongfully confiscated from Mr. Aliaj's home in the Borough of Fort Lee ("Fort Lee") by Fort Lee police officers on April 17, 2025 based on a report that Mr. Aliaj's wife had been involuntarily admitted to a hospital for a mental health evaluation. On or about December 12, 2025, Mr. Aliaj's firearms were released by Fort Lee after the BCPO authorized the release of the firearms that Fort Lee police officers had confiscated and held in accordance with a directive of the Bergen County Prosecutor.

On June 1, 2026, Mr. Aliaj and two (2) new plaintiffs filed a First Amended Complaint ("FAC") with claims against Fort Lee and two other municipalities in the County of Bergen, along with the County Defendants challenging various policies promulgated by the County Defendants. (See Ex. A attached hereto.) The FAC includes three (3) counts; only Count One asserts claims against Fort Lee. Therein, Mr. Aliaj asserts claims against the County Defendants and Fort Lee pursuant to 42 U.S.C. § 1983 for alleged violations of rights under the Second Amendment of the United States Constitution ("Second Amendment") to keep and

1

bear arms. (Ex. A at Count One.) Mr. Aliaj specifically claims that various policies promulgated by the County violated his Second Amendment rights. Mr. Aliaj seeks a declaration that the policies are unconstitutional and asserts claims for damages from both the County Defendants and Fort Lee. Mr. Aliaj's claims against Fort Lee are expressly based on Fort Lee's enforcement of the BCPO's policies.

Fort Lee hereby moves to dismiss Count I of the FAC, pursuant to Fed.R.Civ.P. 12(b)(6), because Mr. Aliaj has not pled a viable claim against the Fort Lee. Moreover, Fort Lee is immune from claims based on its law enforcement actions.

## LEGAL ARGUMENT

### POINT I

**THE CLAIMS IN COUNT ONE OF THE FAC FAIL TO STATE CLAIMS UPON WHICH RELIEF CAN BE GRANTED AGAINST FORT LEE AND SHOULD BE DISMISSED.**

**A.    Standards Governing A Motion To Dismiss Under Fed.R.Civ.P. 12(b)(6).**

Fed. R. Civ. P. 12(b)(6) provides that an action should be dismissed where the complaint "fail[s] to state a claim upon which relief can be granted." The Rule is designed to screen out claims for which there is clearly no remedy or which the plaintiff is without right or power to assert. Port Auth. of N.Y. & N.J. v. Arcadian Corp., 189 F.3d 305, 311-312 (3d Cir. 1999).

2

To survive dismissal, a complaint must contain sufficient factual matter to assert a claim to relief that is plausible on its face. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). Labels, conclusions and formulaic recitation of the elements of a cause of action will not suffice to withstand a motion to dismiss. Id. at 555. Legal conclusions made in the guise of factual allegations are accorded no presumption of truthfulness. Ibid. Thus, this court should not credit a plaintiff's bald assertions and legal conclusions when deciding a motion to dismiss. Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).

All allegations in the complaint must be taken as true and all inferences are to be drawn in the light most favorable to the plaintiff. Warth v. Seldia, 422 U.S. 490, 501 (1975); Phillips v. County of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008). This assumption of truth is inapplicable, however, to "legal conclusions couched as factual allegations" or to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).

As established hereafter, Count I of the FAC should be dismissed because Mr. Aliaj has not set forth a claim upon which relief may be granted against Fort Lee.

**B.    Mr. Aliaj Has Not Pled A Viable Claim For Damages Against Fort Lee Under Section 1983.**

Section 1983 provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State

3

> or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983. "'Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Albright v. Oliver, 510 U.S. 266, 271 (1994) (citation omitted). "To state a claim under § 1983 ..., a plaintiff must establish that (1) the conduct deprived him of his rights, privileges, or immunities secured by the Constitution or laws of the United States or New Jersey and (2) the conduct challenged was committed by a person acting under color of state law."

When evaluating a Section 1983 claim, a court must first "'identify the exact contours of the underlying right said to have been violated' and 'determine whether the plaintiff has alleged a deprivation of a constitutional right at all.'" Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000) (citation omitted).

In 2022, the United States Supreme Court reshaped a court's analysis of whether a regulation violates the Second Amendment of the United States Constitution. In New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1 (2022), the Court held:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its

4

regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

Id. at 17 *citing* Konigsberg v. State Bar of Cal., 366 U.S. 36, 50, n. 10 (1961).[1]

In Count One, Mr. Aliaj asserts that his right to keep and bear arms under the Second Amendment was violated by the County Defendants and Fort Lee and that Mr. Aliaj alleges that he is entitled to the following relief:

a declaration that **County Defendants'** and **Fort Lee'**s confiscation and deprivation of the Seized Aliaj Property, and enforcement of **the Confiscation Policy, Revocation Policy, Compelled Sale Policy, and Compelled Production Policy** against him, violated his Second Amendment rights; an additional declaration that the Duty to Warn Law, the ERPO Act, and the Issuance Disqualifiers are each unconstitutional as applied to Aliaj; and an additional declaration that Directive 2019-2 and its

---

[1] The Court continued to recognize the government's right to regulate the right to bear arms in sensitive places. It specifically held as follows:

Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited - e.g., legislative assemblies, polling places, and courthouses - we are also aware of no disputes regarding the lawfulness of such prohibitions. See D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); see also Brief for Independent Institute as Amicus Curiae 11–17. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible.

5

variants and successor Directives are unconstitutional as applied to Aliaj.

(Ex. A at ¶141 (emphasis added).) Leading up to his request for relief, Mr. Aliaj alleges:

> **County Defendants** and **Fort Lee** deprived Aliaj of the Seized Aliaj Property for a prolonged period and subjected him to the full brunt of **the Confiscation Policy, Revocation Policy, Compelled Sale Policy, and Compelled Production Policy,** and did so intentionally and while acting under color of state law. In so doing, **County Defendants** and **Fort Lee** deprived Aliaj of his fundamental constitutional right to keep and bear arms in his home for over seven months, entirely inconsistent with any historic tradition of firearms regulation, and Aliaj has consequently been damaged for each day that the Seized Aliaj Property was withheld from him.

(Id. at ¶139 (emphasis added).)

**The Confiscation Policy, Revocation Policy, Compelled Sale Policy, and Compelled Production Policy** are policies identified by Mr. Aliaj as policies promulgated by the County Defendants and collectively referred to as "Challenged Policies". Mr. Aliaj alleges as follows regarding the Challenged Policies.

> 4. **County Defendants** have adopted, implemented, enforced, and maintained a series of related policies that together deprive individuals, including Plaintiffs, under **County Defendants**' jurisdiction, from exercising their fundamental rights under the Second Amendment, not premised upon any allegation that Plaintiffs themselves are

6

prohibited, but rather by association with a cohabitant who is so prohibited or otherwise disqualified, or by association with a cohabitant who **County Defendants** perceive to be so prohibited or otherwise disqualified.

5.      These **Challenged Policies** include at least the following: (a) Confiscation of firearms, ammunition, and related accessories based solely on one or more Cohabitant Disqualifications (the "**Confiscation Policy**"); (b) Compelled sales of firearms, ammunition, and related accessories based solely on one or more Cohabitant Disqualifications (the "**Compelled Sale Policy**"); (c) Revocation of Firearms Purchaser Identification Card ("FPIC") or other firearms licenses or permits validly issued under the laws of New Jersey based solely on one or more Cohabitant Disqualifications (the "**Revocation Policy**"); (d) Denial of applications for FPICs or other firearms licenses or permits that would otherwise be validly issued under the laws of New Jersey based solely on one or more Cohabitant Disqualifications (the "**Denial Policy**"); and (e) Compelled production of cohabitant medical records based solely on one or more Cohabitant Disqualifications (the "**Compelled Production Policy**").

6.      These policies (collectively, the "**Challenged Policies**") plainly violate the Constitution and the law.

7.      To enforce the **Challenged Policies**, **County Defendants** routinely and wrongly cite, invoke, or rely on one or more of the following statutes: (i) the so-called "duty to warn" law, codified at N.J.S.A. 2A:62A-16 (the "**Duty to Warn Law**"); or (ii) New Jersey's red flag law, known as the Extreme Risk Protective Order Act of 2018, codified at N.J.S.A. 2C:58-20-32 (the "**ERPO Act**") (under the ERPO Act, firearms and ammunition are confiscated pursuant to Extreme Risk Protective Orders (ERPO) or Temporary Extreme Risk Protective Orders (TERPO); or (iii) N.J.S.A. 2C:58-3(c)(3) (which prohibits the issuance of an FPIC or permit to purchase a

7

handgun to an individual who suffers from various physical and other disabilities), N.J.S.A. 2C:58-3(c)(5) (which prohibits the issuance of an FPIC or permit to purchase a handgun to "any person where the issuance would not be in the interest of the public health, safety, or welfare because the person is found to be lacking the essential character of temperament necessary to be entrusted with a firearm", and N.J.S.A. 2C:58-3(c)(13) (which prohibits the issuance of an FPIC or permit to purchase a handgun to an individual that has undergone certain voluntary or involuntary mental health treatment) (N.J.S.A. 2C:58-3(c)(3), N.J.S.A. 2C:58-3(c)(5), and N.J.S.A. 2C:58-3(c)(13) collectively, the "**Issuance Disqualifiers**").

8.    **County Defendants** routinely and illegally cite, invoke, or rely on the **Duty to Warn Statute, the ERPO Act, or the Issuance Disqualifiers** to disarm law-abiding firearms owners when the individual who is subject to disqualification is not the firearms owner, but rather, the owner's cohabitant.

9.    **County Defendants** also routinely and lawlessly enforce the **Challenged Policies** based on nothing more than "the State's concerns," which are not codified in any law.

10.  Moreover, **County Defendants** direct boroughs, townships, and other municipal subdivisions within Bergen County to adopt, implement, enforce, and maintain the Challenged Policies.

(Id. at ¶¶4-10 (footnote omitted and emphasis added.) Mr. Aliaj also takes issue with BCPO Directives. (See id. at ¶¶118-123.)  It is crystal clear that Mr. Aliaj takes issue with various policies adopted by the County Defendants.

8

As to Fort Lee, Mr. Aliaj alleges that Fort Lee wrongfully confiscated the firearms pursuant to the County's Confiscation Policy and maintained possession thereof pursuant to that policy until returned to Mr. Aliaj.[2] By Mr. Aliaj's allegations, he clearly alleges that he was harmed by unconstitutional policies and directives promulgated by the County Defendants that were followed by Fort Lee police officers.

A municipality many only be held liable for damages for violations under Section 1983 if the deprivation of constitutional rights was caused by a municipal policy or custom. Monell v. Department of Social Services, 436 U.S. 658, 694 (1978). See also, Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990).

The claims in Count One of the FAC against Fort Lee should be dismissed because Mr. Aliaj's claims are predicated on policies promulgated by the County, not Fort Lee. Fort Lee cannot be liable for damages for the policy established by the BCPO.

**C.    Fort Lee Is Immune From Liability For Any Claim By Mr. Aliaj Based On Fort Lee's Enforcement Of The Challenged Policies.**

---

[2] Mr. Aliaj's specific allegations are as follows:

> From the time his firearms, ammunition, and related accessories were improperly confiscated pursuant to the **Confiscation Policy, Fort Lee**, as required by **County Defendants**, maintained continuous possession of the Seized Aliaj Property, consistent with the **Confiscation Policy**, until **Fort Lee** and **County Defendants** agreed to return the Seized Aliaj Property to Aliaj's rightful possession on December 12, 2025—over seven months after his property was improperly confiscated—and only at the insistence of the undersigned counsel and under threat of this lawsuit.

(Ex. A at ¶39.)

9

The New Jersey Tort Claims Act, N.J.S.A. 59:1–1, et seq. ("TCA") is dispositive with respect to causes of action in tort accruing on and after July 1, 1972. Wright v. State, 169 N.J. 422, 435 (2001) *citing* Pressler, Current N.J. Court Rules, comment 17.1 on R. 4:5–4 (2001). The TCA provides qualified immunity from tort claims for a public employee acting "in good faith in the execution or enforcement of any law." N.J.S.A. 59:3–3. Evaluation of immunity under that section is based on the same standard of reasonableness that applies in Section 1983 cases. Gurski v. New Jersey State Police Dept., 242 N.J. Super. 148, 163 (1990). The United States Supreme Court has provided guidance in determining whether a police officer acted in good faith in law enforcement activities so as to be entitled to immunity from liability holding that the relevant focus is whether the "objective (albeit fact-specific) question whether a reasonable officer could have believed [his activity] to be lawful, in light of clearly established law and the information the searching officers possessed." Anderson v. Creighton, 483 U.S. 635, 641 (1987).

After considering Anderson and other precedent, the New Jersey Supreme Court adopted the objective good faith standard for determining whether law enforcement officials are entitled to the qualified immunity defense in Section 1983 actions. Kirk v. City of Newark, 109 N.J. 173 (1988). In Kirk, the plaintiff brought a Section 1983 action against the defendant police detective, alleging that the detective caused him to be arrested without probable cause. The New Jersey Supreme Court observed that the United States Supreme Court "has interpreted section 1983 to limit the rights of

10

plaintiffs and to encourage disposition of the actions as a matter of law, at least when these actions arise out of an alleged unlawful arrest, search, or seizure by a law enforcement officer." Id. at 179. Applying the standard set forth in Anderson, and its predecessors, the Court held that a state law enforcement official is entitled to a favorable judgment as a matter of law where the official's conduct is found to be objectively reasonable under the circumstances. Id. at 185.

Resolution of immunity in a Section 1983 action should be decided early in the proceedings, preferably on a motion for summary judgment or dismissal. Simmons v. Loose, 418 N.J. Super. 206, 222 (App. Div. 2011) *citing* Schneider v. Simonini, 163 N.J. 336, 356, cert. denied, 531 U.S. 1146, 121 S.Ct. 1083, 148 L.Ed.2d 959 (2001).

In this case, Mr. Aliaj alleges as follows with respect to the confiscation of his firearms:

> 33. Consistent with the [**County Defendants'**] **Confiscation Policy**, Sergeant Tropea and Officer Perez, without presenting any warrant or other court order, instructed Aliaj to surrender his firearms because of L.A.'s involuntary admission.

(Ex. A (emphasis added).) As to the alleged wrongful retention of Mr. Aliaj's firearms, he alleges:

> 39. From the time his firearms, ammunition, and related accessories were improperly confiscated pursuant to the [**County Defendants'**] **Confiscation Policy, Fort Lee,** as required by **County Defendants** maintained continuous possession of the Seized Aliaj Property, consistent with the **Confiscation Policy**[.]

11

(Ex. A (emphasis added).) By his allegations, Mr. Aliaj recognizes that the actions of the police officers of Fort Lee were taken in accordance with the County Defendants' Confiscation Policy.

Indeed, Fort Lee's police officers are required to comply with directives of the Bergen County Prosecutor in performance of their duties. Passaic Cnty. PBA Loc. 197 v. Off. of Passaic Cnty. Prosecutor, 385 N.J. Super. 11, 17 (App. Div. 2006) *citing* N.J.S.A. 52:17B–112(b). See also, Bulur v. New Jersey Off. of Att'y Gen., 480 N.J. Super. 395, 404 (App. Div. 2024), rev'd on other grounds, 261 N.J. 275, (2025); State v. Winne, 12 N.J. 152, 167 (1953); Gerofsky v. Passaic County SPCA, 376 N.J.Super. 405, 417 (App. Div. 2005).

Fort Lee is immune from liability based on the police officers good faith compliance with directives of the Bergen County Prosecutor, which they are obliged to follow. For this additional reason, the claims against Fort Lee should be dismissed.

## CONCLUSION

For all of the foregoing reasons, Fort Lee respectfully requests this Court enter an order pursuant to Fed. R. Civ. P. 12(b)(6) dismissing Count One of the First Amended Complaint in its entirety.

Respectfully Submitted,
**CLEARY GIACOBBE ALFIERI JACOBS LLC**
Attorneys for Defendant Borough of Fort Lee

By:    */s/ Mary Anne Groh*
MARY ANNE GROH

Dated: July 14, 2026

12

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### Newark Vicinage

ELSID ALIAJ, MARTIN HRONCICH, and
LUIS RENE DE LA CRUZ FRANCO,

      Plaintiffs,

      -against-

BERGEN COUNTY PROSECUTOR'S
OFFICE, MARK MUSELLA, in his official
capacity as Bergen County Prosecutor,
BOROUGH OF FORT LEE, BOROUGH OF
PARAMUS, and TOWNSHIP OF
ROCHELLE PARK,

      Defendants.

Case No. 2:25-cv-17131

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

        Plaintiffs, ELSID ALIAJ ("Aliaj"), MARTIN HRONCICH ("Hroncich"), and LUIS RENE DE LA CRUZ FRANCO ("De La Cruz") (together, "Plaintiffs") by and through their attorneys, Taylor Dykema PLLC, collectively bring this action against BERGEN COUNTY PROSECUTOR'S OFFICE ("BCPO"), MARK MUSELLA, in his official capacity as Bergen County Prosecutor (together, "County Defendants"), and individually against the BOROUGH OF FORT LEE ("Fort Lee"), the BOROUGH OF PARAMUS ("Paramus") and the TOWNSHIP OF ROCHELLE PARK ("Rochelle Park") (together, "Borough Defendants," and collectively with County Defendants, "Defendants"), respectively, and allege as follows:

## INTRODUCTION

        1.     This action arises under the Second Amendment to the U.S. Constitution (U.S. CONST. amend. II), as incorporated against state and local governments through the Due Process

1

Clause of the Fourteenth Amendment (U.S. CONST. amend. XIV, § 1; *McDonald v. City of Chicago*, 561 U.S. 742 (2010)).

2.    The Second Amendment guarantees the individual right to own firearms (*District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), and the right to carry a firearm in public (*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 19 (2022)). Permits that regulate either the possession or carry of firearms must be "shall issue" and based on clearly defined objective and constitutionally permissible criteria. *Id*.

3.    County Defendants have taken the position that law-abiding New Jersey residents, including Plaintiffs, can be stripped of *their* Second Amendment rights by cohabitating with anyone even suspected by Defendants of being prohibited from possessing firearms.

4.    County Defendants have adopted, implemented, enforced, and maintained a series of related policies that together deprive individuals, including Plaintiffs, under County Defendants' jurisdiction, from exercising their fundamental rights under the Second Amendment, not premised upon any allegation that Plaintiffs themselves are prohibited, but rather *by association* with a cohabitant who is so prohibited or otherwise disqualified, or by *association* with a cohabitant who County Defendants perceive to be so prohibited or otherwise disqualified.

5.    These Challenged Policies include at least the following: (a) Confiscation of firearms, ammunition, and related accessories based solely on one or more Cohabitant Disqualifications[1] (the "Confiscation Policy"); (b) Compelled sales of firearms, ammunition, and related accessories based solely on one or more Cohabitant Disqualifications (the "Compelled Sale Policy"); (c) Revocation of Firearms Purchaser Identification Card ("FPIC") or other firearms licenses or permits validly issued under the laws of New Jersey based solely on one or more

---

[1] "Cohabitant Disqualifications" defined *infra*, ¶ 12.

Cohabitant Disqualifications (the "Revocation Policy"); (d) Denial of applications for FPICs or other firearms licenses or permits that would otherwise be validly issued under the laws of New Jersey based solely on one or more Cohabitant Disqualifications (the "Denial Policy"); and (e) Compelled production of cohabitant medical records based solely on one or more Cohabitant Disqualifications (the "Compelled Production Policy").

6. These policies (collectively, the "Challenged Policies") plainly violate the Constitution and the law.

7. To enforce the Challenged Policies, County Defendants routinely and wrongly cite, invoke, or rely on one or more of the following statutes: (i) the so-called "duty to warn" law, codified at N.J.S.A. 2A:62A-16 (the "Duty to Warn Law"); or (ii) New Jersey's red flag law, known as the Extreme Risk Protective Order Act of 2018, codified at N.J.S.A. 2C:58-20-32 (the "ERPO Act") (under the ERPO Act, firearms and ammunition are confiscated pursuant to Extreme Risk Protective Orders (ERPO) or Temporary Extreme Risk Protective Orders (TERPO); or (iii) N.J.S.A. 2C:58-3(c)(3) (which prohibits the issuance of an FPIC or permit to purchase a handgun to an individual who suffers from various physical and other disabilities), N.J.S.A. 2C:58-3(c)(5) (which prohibits the issuance of an FPIC or permit to purchase a handgun to "any person where the issuance would not be in the interest of the public health, safety, or welfare because the person is found to be lacking the essential character of temperament necessary to be entrusted with a firearm", and N.J.S.A. 2C:58-3(c)(13) (which prohibits the issuance of an FPIC or permit to purchase a handgun to an individual that has undergone certain voluntary or involuntary mental health treatment) (N.J.S.A. 2C:58-3(c)(3), N.J.S.A. 2C:58-3(c)(5), and N.J.S.A. 2C:58-3(c)(13) collectively, the "Issuance Disqualifiers").

8.    County Defendants routinely and illegally cite, invoke, or rely on the Duty to Warn Statute, the ERPO Act, or the Issuance Disqualifiers to disarm law-abiding firearms owners when the individual who is subject to disqualification is not the firearms owner, but rather, the owner's cohabitant.

9.    County Defendants also routinely and lawlessly enforce the Challenged Policies based on nothing more than "the State's concerns," which are not codified in any law.

10.    Moreover, County Defendants direct boroughs, townships, and other municipal subdivisions within Bergen County to adopt, implement, enforce, and maintain the Challenged Policies.

11.    In connection with the Challenged Policies, County Defendants have taken an expansive view of who is a "cohabitant," to include any individual natural person, whether adult or child, family member or non-family member, who domiciles, dwells, lives, or resides, full-time or part-time, temporarily or permanently, at any abode, dwelling, home, house, apartment, co-op, condominium, rental, or lawful residence of any kind, with the individual in question.

12.    Also in connection with the Challenged Policies, County Defendants consider a cohabitant to be prohibited or disqualified from exercising Second Amendment rights: (a) based on County Defendants' perception that the cohabitant is disqualified under federal law including but not limited to 18 U.S.C. § 922(g); (b) based on County Defendants' perception that the cohabitant is disqualified under New Jersey state law including but not limited to the various subsections of N.J.S.A. 2C:58-3(c); or (c) simply based on County Defendants' perception that a cohabitant is disqualified in the boundless discretion of County Defendants (collectively, "Cohabitant Disqualifications").

4

13. As discussed in further detail *infra*, by implementing the Challenged Policies, Defendants are depriving Plaintiffs of their Second Amendment rights, even though they are under no legal, mental, or physical disability and subject to no disqualifying factor. This Defendants may not do, *full stop*.

14. Accordingly, Plaintiffs bring this action to vindicate their fundamental rights to keep and bear arms under the Second Amendment.

## PARTIES

15. Plaintiff Aliaj is a 38-year-old natural person, United States citizen, and a citizen of the State of New Jersey residing in Fort Lee, Bergen County. Aliaj is a peaceable, law-abiding citizen who is not disqualified in any way from ownership, possession, and use of firearms.

16. Plaintiff Hroncich is a 57-year-old natural person, United States citizen, and a citizen of the State of New Jersey residing in Paramus, Bergen County. Hroncich is a peaceable, law-abiding citizen who is not disqualified in any way from ownership, possession, and use of firearms.

17. Plaintiff De La Cruz is a 38-year-old natural person, United States citizen, and a citizen of the State of New Jersey residing in Rochelle Park, Bergen County. De La Cruz is a peaceable, law-abiding citizen who is not disqualified in any way from ownership, possession, and use of firearms.

18. Defendant BCPO is a law enforcement office existing under the laws of the State of New Jersey and with law enforcement and prosecutorial jurisdiction in Bergen County, including Fort Lee, Paramus, and Rochelle Park.

19. Defendant Musella is the chief prosecutor in Bergen County as head of BCPO.

20.     Defendant Fort Lee is a municipality located in Bergen County, organized and existing under the laws of the State of New Jersey.

21.     Defendant Paramus is a municipality located in Bergen County, organized and existing under the laws of the State of New Jersey.

22.     Defendant Rochelle Park is a municipality located in Bergen County, organized and existing under the laws of the State of New Jersey.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343, which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights and privileges provided for under the U.S. Constitution.

24.     This action, based on violations of Plaintiffs' constitutional rights, is brought under 42 U.S.C. § 1983 and seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and damages, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

25.     Due to the ongoing and imminent harm caused by the confiscation and deprivation of Plaintiffs' property, there is an actual and justiciable controversy between the parties necessitating declaratory relief.

26.     This Court has personal jurisdiction over the Defendants since they are situated within the District of New Jersey.

27.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants are citizens of the State of New Jersey, where the District of New Jersey is located; or, alternatively, under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### I.     The Confiscation of Aliaj's Firearms

28.     On April 17, 2025, the Fort Lee Police Department ("FLPD")—based on a report from the Englewood Police Department ("EPD") that Aliaj's wife (hereinafter referred to as "L.A.") had been involuntarily admitted to New Bridge Medical Center for a mental health evaluation (in what turned out to be a language-related misunderstanding, resulting in L.A.'s discharge with a diagnosis of "Adjustment disorder with depressed mood Seven weeks pregnant")—confiscated Aliaj's firearms, ammunition, and related accessories from his home.

29.     In fact, as was ultimately confirmed by her medical providers, L.A. did not want to harm herself and was not a threat to herself or others.

30.     Notwithstanding this misunderstanding, later that evening, at about 8:45 p.m., Police Officer Iacovo of the EPD contacted FLPD headquarters and advised that the EPD had taken L.A. to New Bridge Medical Center and had conducted a computer search of Aliaj's registered firearms.

31.     At approximately 9:30 p.m., Detective Sergeant D. Tropea and Police Officer J. Perez of FLPD arrived at Aliaj's home, where he and L.A. reside together.

32.     L.A. does not now, and has never, owned any firearms.

33.     Consistent with the Confiscation Policy, Sergeant Tropea and Officer Perez, without presenting any warrant or other court order, instructed Aliaj to surrender his firearms because of L.A.'s involuntary admission.

34.     Although bewildered by this sudden and illegal demand, Aliaj, believing he would be arrested if he did not comply, had no choice but to cooperate. Accordingly, he surrendered the following firearms, ammunition, and related accessories to Sergeant Tropea and Officer Perez: (a)

black Smith & Wesson M&P 15 (rifle), equipped with a Holosun HM3X magnifier and a Sig Sauer RomeoX sight, (b) black Springfield Armory XD (handgun), (c) metallic grey Springfield Armory 9mm (handgun), (d) one Springfield Armory ten-round handgun magazine, (e) three Magpul ten-round rifle magazines. (5.56/.223), (f) two boxes of Hornady Critical Defense 9mm ammunition, 115 grain bullets (25-count each), and (g) one box of Winchester 5.56, 55 grain FMJ (200-count) (collectively, the "Seized Aliaj Property").

35. Several days later, on April 21, 2025, L.A. was discharged with a diagnosis of "Adjustment disorder with depressed mood" and a note that she was "Seven weeks pregnant."

36. Moreover, L.A.'s medical records contain the following notation under an entry entitled "Hospital Course": "As patient's acute symptoms resolved since admission *she was not presenting acutely anxious depressed suicidal or psychotic she did not meet the criteria for continued inpatient psychiatric hospitalization* and was discharged back to the care of husband . . . ." (Emphasis added).

37. Additionally, a notation under an entry entitled "Suicidal and Self Injurious Behavior" states:

> ACTUAL SUICIDE ATTEMPT: None reported; INTERRUPTED SUICIDE ATTEMPT: None reported; ABORTED OR SELF-INTERRUPTED ATTEMPT: None reported; OTHER PREPARATORY ACTS TO KILL SELF: None reported; SELF-INJURIOUS BEHAVIOR WITHOUT SUICIDAL INTENT: None reported.

## II. The Lengthy Deprivation of Aliaj's Rights & County Defendants' Subsequent Concessions of Wrongdoing

38. Aliaj commenced this action with the filing of his Complaint on November 3, 2025 (ECF No. 1).

39. From the time his firearms, ammunition, and related accessories were improperly confiscated pursuant to the Confiscation Policy, Fort Lee, as required by County Defendants,

maintained continuous possession of the Seized Aliaj Property, consistent with the Confiscation Policy, until Fort Lee and County Defendants agreed to return the Seized Aliaj Property to Aliaj's rightful possession on December 12, 2025—over *seven months* after his property was improperly confiscated—and only at the insistence of the undersigned counsel and under threat of this lawsuit.

40.    Aliaj has a Metallitrend brand gun safe which is 57 inches tall, has anti-theft technology, and can only be opened using a passcode, biometric input, or a key.

41.    Aliaj has not shared the passcode or key to the safe with L.A., and only his biometric input is recognized by the safe.

42.    Aliaj intended to and did immediately lock his firearms in his gun safe upon their return to him, restricting access to anyone besides himself.

43.    On April 26, 2025, Aliaj emailed Amy West ("West"), a Paralegal Specialist at BCPO, and wrote: "Hi Amy, Fort Lee Police told me to contact you for returning my firearms. Please advise."

44.    On April 28, 2025, West, consistent with the Confiscation Policy and the Compelled Sale Policy, replied:

> Morning! Since your wife was committed to New Bridge Medical Center, the Bergen County Prosecutor's office will not agree to the firearms being returned to your home. The options available to you are to store in an offsite firearm storage facility, sell the firearms, destroy the firearms, or have a hearing to try and have the firearms returned to your home. Please let me know what you would like to do and we will go from there.

45.    In a reply email the same day, Aliaj initially indicated he would try a hearing. However, West quickly informed Aliaj: "OK just so that you are aware, a hearing will not be until about September or later."

46.     As the email exchange continued to April 28, 2025, Aliaj, without the benefit of counsel, initially did not object to the lengthy delay for a hearing and inquired about the option to sell his firearms, before again selecting the hearing option in a subsequent email. However, troubled by the unreasonableness of the contemplated process, he astutely asked: "[W]hy is the hearing so far out I thought this was a temporary thing and hearings are supposed to happen within some short time limit?" West unhelpfully offered that "[w]e have a lot of cases and the Courts are backed up with hearings/trials."

47.     A month later, on May 28, 2025, Aliaj wrote: "Amy, Are there any reports that I can get for this? Nobody has given me anything. Is there an ERPO or TERPO for this? Can you provide a copy?" That same day, West replied: "There is no ERPO. Your weapons were seized as stated in the original email to you. Paperwork will be supplied when the motion is filed to have the hearing."

48.     At this point, Aliaj, having reflected further, now understood that he was facing an obvious ongoing violation of his constitutional rights. He replied: "Hi Amy thanks for the prompt response. Is there a TERPO? Under what legal statute [sic], grounds, procedure were they confiscated?

49.     West inexplicably replied: "The Police should have explained this at the time of the seizure. This falls under the duty to warn law because your wife was involuntarily committed. There is no ERPO."

50.     N.J.S.A. 2A:62A-16.1.e, which is part of the Duty to Warn Law, provides, in relevant part, "[a] firearm surrendered or seized pursuant to this subsection which is not legally owned by the patient shall be *immediately* returned to the legal owner of the firearm if the legal

10

owner submits a written request to the prosecutor attesting that the patient does not have access to the firearm." (Emphasis added).

51.     As the Seized Aliaj Property was legally owned by Aliaj, not L.A., Aliaj sought to utilize this statutory provision which exists to provide a mechanism whereby a disarmed individual could expeditiously recover their firearms which were confiscated due to another individual triggering the duty to warn law.

52.     Accordingly, on June 23, 2025, Aliaj emailed West a demand pursuant to N.J.S.A. 2A:62A-16.1.e, informing BCPO of his gun safe, which L.A. did not have access to, and requesting the immediate return of his firearms and ammunition, which, upon their return, would be securely stored in said safe. Aliaj wrote:

> On the advice of counsel, I formally submit the following statement:
>
> NJ Rev Stat § 2A:62A-16, subsection (e), states in relevant part, "A firearm surrendered or seized pursuant to this subsection which is not legally owned by the patient shall be immediately returned to the legal owner of the firearm if the legal owner submits a written request to the prosecutor attesting that the patient does not have access to the firearm."
>
> I hereby attest that, 1) the firearms I keep in my home will be stored in a locked, metallic, fireproof safe which my wife, [L.A.], cannot access, 2) when locked, the means to enter the safe are under my constant control, and 3) the firearms in question are only removed by me and remain under my control when not locked in the safe.
>
> I hereby request the immediate return of my property as described in the attached report submitted by P.O. Iacovo of the Fort Lee Police Department on April 17, 2025 (Incident #I-2025-021729) to include:
>
> One (1) black Smith & Wesson M&P (Serial Number TW51695), equipped with a Holosun HM3X and Sig Sauer RomeoX
>
> One (1) black Springfield Armory XD (Serial Number: BF432419)
>
> One (1) metallic grey Springfield Armory 9mm, 10-round magazine

11

Three (3) Magpul 10-round rifle magazine (5.56x45 NATO/.223 Remington)

Two (2) boxes of Hornady Critical Defense 9mm, 115 grain bullets (25-count each)

One (1) box of Winchester 5.56mm M193, 55 grain FMJ (200-count)

Best,

Elsid

53.     Although the statute does not provide any discretion to reject such a request, BCPO ignored Aliaj. When no response was forthcoming, and fully aware that Fort Lee and County Defendants were violating his rights, Aliaj emailed West on June 26, 2025, and asked, "when I can arrange to come pick up my property." West, remaining consistent with the Confiscation Policy, replied: "I have received all your emails, and the case is still pending. You cannot pick up anything at this time."

54.     Aliaj's fruitless and futile communications with BCPO continued into July, at this point with Assistant Prosecutor David Aguirre ("Aguirre"), who insisted that Aliaj provide L.A.'s medical records so that BCPO could determine that she was not a danger. By email dated July 17, 2025, Aguirre, consistent with the Confiscation Policy, Revocation Policy, Denial Policy, and the Compelled Production Policy, wrote, *inter alia*:

> With the records we will be able to determine if she is a danger to herself or the community. If we determine that she is not a danger, then we may be able to resolve the matter without filing motions. If you are not amenable to this option, I will be filing a motion to revoke your FPIC and a motion for your wife's medical records . . . . please let me know asap.

55.     On July 23, 2025, faced with Aguirre's illegal threats, Aliaj initially agreed to provide L.A.'s medical records.

56.     However, after consulting with counsel, Aliaj realized that he was legally entitled to the return of the Seized Aliaj Property irrespective of the contents of L.A.'s medical records,

12

and that Aguirre had no legal basis to condition the *possible* return of the Seized Aliaj Property on

Aliaj's furnishing of L.A.'s medical records. Aliaj also realized that County Defendants had no

legal authority to compel *him to* produce *his wife's* medical records, as this was entirely

inconsistent with well-established law relating to patient privacy and patient control over medical

records. Accordingly, Aliaj decided not to provide the medical records in the face of Aguirre's

coercion.

57.     Further discussion between undersigned counsel and BCPO only further confirmed

that Fort Lee and County Defendants had no basis in statutory or case law to continue the

Deprivation.

58.     On September 11, 2025, undersigned counsel emailed Aguirre and inquired, *inter*

*alia*:

> Can you please provide me with the statutory or case authority you are invoking,
> or intend to rely on, to require Mr. Aliaj to furnish his wife's medical records in
> exchange for getting his constitutionally protected property returned promptly?
> There is no ERPO/TERPO here, and I've reviewed the "duty to warn" law, which
> in no way contemplates any such requirement for a family member or cohabitant
> who is not disqualified from firearms ownership/possession--such as Mr. Aliaj.
> Thank you.

59.     Aguirre, consistent with the Confiscation Policy and the Compelled Production

Policy, replied:

> Prior to Mr. Aliaj hiring you I spoke candidly with him and told him that the basis
> of the pending motion to revoke is that *the State has concerns about weapons being*
> *present in the home when his wife is making statements about wanting to hurt*
> *herself and is schizophrenic/bipolar*. In our conversations Mr. Aliaj advised that
> Bergen New Bridge cleared her and deemed she was not a threat to herself or
> anyone else. I told Mr. Aliaj that if I could get her medical records to substantiate
> his claim, the State's concerns may be assuaged.
>
> (Emphasis added).

60.     Aguirre's response was telling—he was unable to invoke any legal authority for confiscating Aliaj's firearms; nor could he, because there is no such authority. The only "authority" that he could concoct was the "State's concerns"—which is not a legally recognized basis to confiscate and retain a citizen's firearms and ammunition, nor to revoke a FPIC.

61.     Undersigned counsel continued to press Aguirre for a legal citation in further email and verbal communications.

62.     However, rather than continuing to discuss the situation in good faith, Aguirre simply enforced the Revocation Policy by initiating a bad-faith, retaliatory proceeding without explanation or warning.

63.     Pursuant to their Revocation Policy, County Defendants sought not only to revoke Aliaj's FPIC, but also to compel the production of L.A.'s mental health and psychiatric records pursuant to their Compelled Production Policy, and to compel the sale of Aliaj's firearms pursuant to their Compelled Sale Policy.

64.     County Defendants had no legal authority to ransom Aliaj's firearms and ammunition in exchange for intrusion into L.A.'s private medical affairs, nor was Aliaj legally required to comply with such a demand.

65.     As a result, Aliaj endured a prolonged deprivation and violation of his constitutional right to bear arms—lasting over *seven months*—and, when he challenged that deprivation and violation, he faced retaliation from Aguirre, who wielded the full force of the Confiscation Policy, Revocation Policy, Compelled Sale Policy, and Compelled Production Policy against Aliaj.

66.     On December 11, 2025, County Defendants—after failing to invoke any legal authority for confiscating the Seized Aliaj Property, despite being repeatedly and respectfully asked to do so by the undersigned counsel—submitted a letter to the Hon. Kevin J. Purvin of the

14

New Jersey Superior Court, requesting "that the Motion to Revoke Elsid Aliaj's Firearms Purchaser Identification Card and Compelling the Sale of his Firearms be WITHDRAWN" and that "[a]ny additional motions pertaining to the production of medical records are also WITHDRAWN."

67.     The next day, December 12, 2025, Aliaj, with the consent and knowledge of the reluctant and unapologetic County Defendants, traveled to FLPD headquarters together with undersigned counsel, and retrieved the Seized Aliaj Property from FLPD headquarters to return it to his lawful possession in his home, concluding a more than *seven-month* illegal deprivation and violation of his constitutional right to bear arms.

68.     County Defendants' brazen enforcement of various Challenged Policies against Aliaj, followed by their hasty withdrawal of the revocation proceeding against Aliaj and reluctant return of the Seized Aliaj Property, clearly demonstrates that the Challenged Policies exist, that County Defendants know the Challenged Policies are illegal, and that County Defendants only relax enforcement of the Policies when they are sued, and only for individuals who undertake the substantial time and effort, and expends the resources, to sue.

**III.     The Denial of Hroncich's Firearm Purchase Application & Revocation Proceeding Against Hroncich**

69.     On March 4, 2020, Hroncich's then 18-year-old daughter (hereinafter referred to as "F.H."), was involved in a misunderstanding while attending Paramus High School as a student, which caused staff employed by the school's Guidance Department to mistakenly believe that F.H. intended to harm herself.

70.     That same day, at approximately 1:00 p.m., officers from the Paramus Police Department ("PPD") were dispatched to the residence F.H. shared with Hroncich at the time, and subsequently transported her to New Bridge Medical Center for evaluation.

15

71.     As was ultimately confirmed by her medical providers, F.H. did not want to harm herself, and she was not a threat to herself or others—rather, she was simply reacting in a manner of a typical teenage high school student who was distraught after breaking up with her boyfriend at the time, when she told a friend that "she did not know what she wanted to do with her life anymore."

72.     Later the same day, at approximately 7:00 p.m., F.H. was discharged from New Bridge Medical Center with a diagnosis of "Relationship distress with intimate partner."

73.     Additionally, F.H.'s medical records contain the following notation under an entry entitled "Summary/Formulation," which noted in relevant part:

> "18 year old female was BIB by police after a misunderstanding. . . On DOE, patient had a break up with her boyfriend, when patent's friend told guidance counsellor. On evaluation she denied suicidal ideation, reports she may have made a statement of 'not wanting to live' out of frustration due to recent break up however does not even remember stating it on evaluation. She is calm, cooperative, forthcoming with history, is anxious and appropriate for the contextual setting… [B]ased off of psychiatric evaluation *this patient does not appear to be an Imminent danger to self, others or property at this time and does not requires [sic.] inpatient hospitalization for stabilization*" (emphasis added).

74.     Notwithstanding the foregoing, on June 7, 2023, Paramus, consistent with the Denial Policy, denied Hroncich's May 7, 2023 application for a permit to purchase a handgun, citing the mistaken understanding that F.H. was transported to hospital "after she told a friend that she did not want to live anymore" on March 4, 2020.

75.     Paramus' denial of Hroncich's May 7 application based on the misunderstood events of March 4, 2020 was inexplicably effectuated despite previously *approving* Hroncich's FPIC application, and prior handgun purchase permit applications on November 4, 2022—*more than two years* after the misunderstanding involving F.H. occurred.

76. Subsequently, following Hroncich's appeal of Paramus' denial of his May 7, 2023, application, on August 10, 2023, pursuant to the Denial Policy and the Revocation Policy, County Defendants initiated a retaliatory revocation proceeding in the Superior Court of New Jersey, seeking revocation of Hroncich's FPIC.

77. At a May 7, 2024 hearing in the revocation proceeding against Hroncich, Judge Purvin ruled in favor of Hroncich, and County Defendants were ordered to reissue Hroncich's FPIC, which he received by email the following day, on May 8, 2024, but only after great expenditure of time, effort, and financial resources.

**IV. The Confiscation of De La Cruz's Firearm**

78. On or about December 5, 2026, De La Cruz's then 11-year-old son (hereinafter referred to as "S.D."), was involved in a misunderstanding related to a communication on social media between S.D., and a fellow student at Midland School in Rochelle Park, which caused school staff members to mistakenly believe that S.D. intended to cause harm to the fellow student.

79. In fact, as was ultimately confirmed by his mental health provider, S.D. did not intend to harm another individual and did not represent a threat to himself or others.

80. Notwithstanding the misunderstanding, Rochelle Park Police Department obtained a TERPO against S.D. (and not against De La Cruz) under the ERPO Act.

81. Later that evening, at approximately 12:15 a.m. on December 6, 2024, two RPPD officers arrived at De La Cruz's home, where he and S.D. reside together, requesting to speak with S.D.

82. Due to his status as a minor, S.D. does not, and has never, owned any firearms.

17

83.     The RPPD officers subsequently interrogated De La Cruz about the location of his firearm, which was at all relevant times secured in a firearm safe located in his upstairs master bedroom.

84.     De La Cruz was unaware of any TERPO and remained unaware of any TERPO until May 29, 2026.

85.     After the RPPD officers requested entry to the De La Cruz home, De La Cruz, afraid of what RPPD might do to him if he refused, reluctantly agreed, at which point they accompanied De La Cruz to his bedroom, where they subsequently asked De La Cruz to identify the location of his firearm safe, and to input the access code.

86.     Pursuant to the Confiscation Policy, and without presenting any warrant or other court order, the RPPD officers instructed De La Cruz to surrender his firearm for "one or two days," until the matter involving the misunderstood communication between S.D. and his schoolmate was sorted out.

87.     Although bewildered by this sudden and illegal demand, De La Cruz, believing he could be arrested or physically harmed if he did not comply, had no choice but to cooperate and comply with the Confiscation Policy. Accordingly, he surrendered the following firearm, to the RPPD officers: one Glock 22 .40 caliber handgun, identified by serial no. BWHP100 (the "Seized De La Cruz Firearm").

88.     Several days later, on a December 9, 2024, a social worker assigned to S.D. issued an opinion letter to S.D.'s Midland School guidance counsellor, which stated that she "completed a school clearance assessment for [S.D.], along with his father, Luis De La Cruz" and determined that "[a]t this time, [S.D.] does not present as a danger to himself or others and therefore is cleared to return to school."

**V.    The Continuing Deprivation of De La Cruz's Rights & County Defendants' Concession of Wrongdoing**

89.    On December 6, 2024, De La Cruz's FPIC—which had previously been valid since its approval on July 15, 2024—was post-facto denied by Rochelle Park, consistent with the Denial Policy and the Revocation Policy.

90.    Rochelle Park elected to enforce County Defendants' Denial Policy and Revocation Policy by flagrantly disregarding the revocation procedure established by N.J.S.A. 2C:58-3(f), which mandates in pertinent part that "upon the application of the county prosecutor of any county," or "the chief police officer of any municipality," an FPIC "may be revoked by the Superior Court of the county wherein the card was issued *after hearing upon notice, upon a finding that the holder thereof no longer qualifies for the issuance of the permit*" (emphasis added).

91.    By effectuating the post-facto denial of De La Cruz's FPIC—which at the time, had already been approved and valid for over *four months*—Rochelle Park and County Defendants subverted the revocation procedure established by N.J.S.A. 2C:58-3(f), one which would have afforded De La Cruz notice and a hearing.

92.    Indeed, Rochelle Park and County Defendants carried out their ill-contrived, extrajudicial, and unlawful post-facto denial of De La Cruz's FPIC in the absence of any notice to De La Cruz, and in the absence of any valid court order or proceeding.

93.    Consistent with the Confiscation Policy and illegally relying at least in part on the TERPO issued against S.D., Rochelle Park officials, aided by County Defendants, have maintained continuous possession of the Seized De La Cruz Firearm since it was improperly confiscated on December 6, 2024—*almost a year and a half* at the time of this filing.

94.    De La Cruz has a handgun safe with anti-theft technology, which can only be opened using a passcode, or a key.

19

95. De La Cruz has not shared the passcode or key to his handgun safe with S.D.

96. De La Cruz intends to immediately lock his firearm in his handgun safe upon its return to him, restricting access to anyone besides himself.

97. Until May 29, 2026, De La Cruz's numerous attempts to contact Rochelle Park officials via phone and email to obtain an update on the status of his FPIC and his firearm went completely and totally unanswered, and as a result, De La Cruz faces the ongoing deprivation and violation of his constitutional right to bear arms.

98. Moreover, because of the ongoing deprivation and violation of his constitutional right to bear arms at the hands of Rochelle Park and County Defendants, De La Cruz has been forced to forfeit a new employment opportunity—one which would have provided De La Cruz with a significant increase in his earnings—serving as a SORA-licensed armed commercial driver, which requires prospective employees to maintain a valid FPIC.

99. On May 29, 2026, County Defendants—after failing to invoke any legal authority for confiscating the Seized De La Cruz Firearm other than the TERPO against S.D., and continuing to try and cover their tracks before the amendment of this lawsuit, presented a draft "Consent Order" to De La Cruz and asked him to sign it in exchange for the return of the Firearm.

100. However, the Consent Order, rather than being a good faith offer to restore De La Cruz's Second Amendment rights, was a disingenuous attempt to get De La Cruz to ransom the De La Cruz Firearm in exchange for a release from liability, without the benefit of counsel. De La Cruz did not sign the Consent Order because it falsely stated that he had "voluntarily" surrendered his firearm and purported to release County Defendants by referring to the conclusion of "all" related proceedings.

101. The Consent Order stated inaccurately, in pertinent part:

20

**Whereas** Luis Delacruz Franco voluntarily surrendered his firearms on December 6, 2024 because of a Temporary Extreme Risk Protective Order issued by the Rochelle Park Police department due to an issue with his son S.D.

**Whereas** the temporary extreme risk protective order has against S.D. has since been dismissed, and all related proceedings have concluded.

**IT IS** on this _____ day of _____, 2026,

**ORDERED** that respondents **Lawfully owned and New Jersey State compliant firearms** be returned to Luis Delacruz Franco by the Rochelle Park Police department upon receipt of this order.

**ORDERED** that any property legally belonging to Luis Delacruz Franco currently in the possession of the Rochelle Park Police Department, which was taken into custody of by the Rochelle Park Police Department on or about December 6, 2024, are hereby **RETURNED**; to Luis Delacruz Franco

102. County Defendants' brazen enforcement of various Challenged Policies against De La Cruz, followed by their sudden illusory offer to return the Seized De La Cruz Firearm mere days before the publicly known amendment deadline for this lawsuit, clearly demonstrates that the Challenged Policies exist, that County Defendants know the Challenged Policies are illegal, and that County Defendants only relax enforcement of the Policies when they are sued.

**VI.    Relevant New Jersey Laws Invoked by County Defendants**

103. As referenced *supra*, New Jersey's Duty to Warn Law is codified at <u>N.J.S.A</u>. 2A:62A-16.

104. Under the Duty to Warn Law, health care professionals have a "duty to warn and protect" where a patient has communicated "a threat of imminent, serious physical violence against a readily identifiable individual or against himself" or where the practitioner believes that "the patient intended to carry out an act of imminent, serious physical violence against a readily identifiable individual or against himself." <u>N.J.S.A</u>. 2A:62A-16.1.b(1), (2).

105.    Practitioners are also required, where applicable, to notify law enforcement of such imminent danger, including the identity of the patient.

106.    In addition, the patient can be compelled to surrender his or her firearms, under the following circumstances:

> If *the patient* has been issued a firearms purchaser identification card, permit to purchase a handgun, or any other permit or license authorizing possession of a firearm, or if there is information indicating that *the patient* otherwise may have access to a firearm, the information provided may be used in determining whether *the patient* has become subject to any of the disabilities set forth in subsection c. of N.J.S.2C:58-3. If the chief law enforcement officer or superintendent, as appropriate, determines that *the patient* has become subject to any of the disabilities set forth in subsection c. of N.J.S.2C:58-3, any identification card or permit issued to the patient shall be void and subject to revocation by the Superior Court in accordance with the procedure established in subsection f. of N.J.S.2C:58-3.

> N.J.S.A. 2A:62A-16.1.e. (Emphasis added).

107.    With respect to seizure of firearms, the duty to warn law only applies to the patient who is the subject of the report and the firearms they have access to, but it does *not* apply to the firearms of family members or co-habitants which the patient does not have access to. Moreover, the surrender of firearms under the duty to warn law requires a court order.

108.    Since Aliaj was not himself the subject of any "duty to warn" report, he was not legally subject to seizure of his firearms, ammunition, and related accessories—the Seized Aliaj Property.

109.    Moreover, even if, *arguendo*, the initial confiscation of the Seized Aliaj Property was proper, Defendants' failure to return the Seized Aliaj Property is a violation of the duty to warn statute which provides "[a] firearm surrendered or seized pursuant to this subsection which is not legally owned by the patient *shall be immediately returned to the legal owner* of the firearm

22

if the legal owner submits a written request to the prosecutor attesting that the patient does not have access to the firearm." (Emphasis added).

110.   In addition to the Duty to Warn Law, New Jersey is one of the minority of states that has a so-called "red flag law" pursuant to which a civil court, upon commencement petition by a law enforcement officer or private citizen, can petition for the issuance of a warrant (a) directing the respondent named in the petition to immediately surrender to law enforcement all firearms and ammunition owned or otherwise possessed by the respondent, and (b) prohibiting the respondent from purchasing or possessing firearms or ammunition for a prescribed period of time.

111.   New Jersey's red flag law, the ERPO Act, is codified at N.J.S.A. 2C:58-20-32.

112.   Under the ERPO Act, firearms and ammunition are confiscated pursuant to ERPOs and TERPOs.

113.   At no time have Plaintiffs been the subject of an ERPO or a TERPO. And the only cohabitant who was the subject of a TERPO was S.D., De La Cruz's son. Neither Borough Defendants, BCPO, or any private citizen filed a petition against Plaintiffs pursuant to the ERPO Act.

114.   Since De La Cruz was not himself the subject of any TERPO or ERPO, he was not legally subject to seizure of his handgun—the Seized De La Cruz Firearm.

115.   Defendants also relied on the Issuance Disqualifiers to enforce the Challenged Policies: (i) N.J.S.A. 2C:58-3(c)(3), which prohibits the issuance of an FPIC or permit to purchase a handgun to "any person who suffers from physical defect or disease which would make it unsafe for that person to handle firearms, to any person with a substance use disorder unless any of the foregoing persons produces a certificate of a medical doctor, treatment provider, or psychiatrist licensed in New Jersey, or other satisfactory proof, that the person no longer has that particular

disability in a manner that would interfere with or handicap that person in the handling of firearms"; (ii) N.J.S.A. 2C:58-3(c)(5), which prohibits the issuance of an FPIC to "any person where the issuance would not be in the interest of the public health, safety, or welfare because the person is found to be lacking the essential character of temperament necessary to be entrusted with a firearm"; (iii) N.J.S.A. 2C:58-3(c)(13) prohibits issuance of an FPIC to any person that has been voluntarily admitted to inpatient treatment or involuntarily committed to inpatient or outpatient treatment, unless the court has expunged the person's record.

116. Defendants cited, invoked, and relied upon one or more of the Issuance Disqualifiers against each of the Plaintiffs, even though none of the Issuance Disqualifiers were applicable to any of the Plaintiffs, but *at most* only applicable to their cohabitants.

117. Moreover, in Plaintiff Aliaj's case, and upon information and belief in many other instances including against De La Cruz and Hroncich, BCPO lawlessly cited, invoked, or relied on the "State's concerns" or variants thereof.

### VII. Relevant BCPO Directives

118. In addition to their lawless misuse of inapplicable laws, County Defendants have also at various times reduced some aspects of the Challenged Policies to writing, in the process demonstrating their authority over the Borough Defendants on matters of firearms regulation.

119. For example, on February 5, 2019, BCPO issued "Bergen County Prosecutor's Office Law Enforcement Directive No. 2019-2" ("Directive 2019-2") to "ALL BERGEN COUNTY CHIEFS OF POLICE, POLICE DIRECTORS, OFFICERS-IN-CHARGE, AND SHERIFF" which was meant to supplement the so-called "Bergen County Prosecutor's Office Law Enforcement Directive No. 2018-5." Both Directives related to enforcement of the Duty to Warn Law.

120. Directive 2019-2 provides, in pertinent part:

Under this Directive, whenever a Bergen County law enforcement agency receives information or a warning related to a threat of imminent, serious physical violence to self or others made by an individual suspected of suffering from a mental illness, whether that information comes from a mental health provider or any other source, the respective police department must ascertain whether the individual has been issued a firearms purchaser identification card ("FPIC"), any permit to purchase or possess a firearm, or whether the patient may possess or have access to any firearm . . . .

Additionally, if the respective law enforcement agency determines that the individual possess a FPIC or permit to purchase or possess a firearm, or possesses or has access to a firearm, the law enforcement agency must attempt to secure the identification card, permit, and/or firearms either consensually or with a warrant if consent is denied, on the basis of the imminent threat of serious harm.

121. As demonstrated by Directive 2019-2, citizens such as Aliaj and De La Cruz do not have any legitimate option to refuse consent to seizure of their firearms, since, under Directive 2019-2, law enforcement must seek a warrant if consent is denied.

122. County Defendants have interpreted Directive 2019-2 as broadly as possible to effectuate the Challenged Policies, expanding the reach of the Directive to include firearms owners who live with the purportedly disqualified cohabitants.

123. Upon information and belief, County Defendants have promulgated additional similar Directives designed to expand the Challenged Policies.

### CLAIMS FOR RELIEF

**COUNT ONE**
**Violation of the United States Constitution**
**Second & Fourteenth Amendments**
**(42 U.S.C. § 1983)**
**(Aliaj v. County Defendants and Fort Lee)**

124. Aliaj repeats, realleges, and incorporates by reference every allegation of the foregoing paragraphs as if fully set forth in each claim for relief.

25

125.    Aliaj brings his claim pursuant to 42 U.S.C. § 1983, which provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights . . . . secured by the Constitution and laws [of the United States], shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

126.    The Second Amendment to the U.S. Constitution provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

> U.S. CONST. amend. II.

127.    Incorporated against the states through the Due Process Clause of the Fourteenth Amendment *McDonald*, 561 U.S. 742, the Second Amendment guarantees "an individual right to keep and bear arms," *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). It is "a fundamental constitutional right guaranteed to the people," *id.*, which is and has always been key to "our scheme of ordered liberty." *McDonald*, 561 U.S. at 767-68.

128.    "*Heller* . . . demands a test rooted in the Second Amendment's text, as informed by history." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 19 (2022) (citing *Heller*, 554 U.S. 570). Consistent with this demand, and because "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms," *Heller*, 554 U.S. at 582, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.

129.    Here, as a threshold matter, County Defendants and Fort Lee are unquestionably governmental entities and/or governmental actors, all subject to the Second Amendment.

130.    Therefore, since County Defendants and Fort Lee are subject to the Second Amendment, the only other question is whether their conduct violated the Second Amendment.

Applying the historical and textual test that *Heller* and *Bruen* require, the answer to this question is undoubtedly yes.

131. Aliaj's right to keep and bear arms was infringed when Defendants unlawfully seized his constitutionally protected firearms, ammunition, and related items, refused to return them pursuant to New Jersey statutory requirements, and then proceeded to extend what should have been at most a temporary constitutional infringement into a potentially permanent one by instigating the retaliatory Revocation Proceeding.

132. As a result, Aliaj was completely barred from exercising his fundamental right to keep and bear arms, including handguns, in his "*home*, where the need for defense of self, family, and property is *most acute*." *Heller*, 554 U.S. at 628 (emphases added).

133. This is not a close case. Rather, County Defendants and Fort Lee have blatantly thumbed their nose at the clear precedent of the Supreme Court of the United States and will continue to do so absent court intervention. A governmental entity simply may not prevent a peaceable, law-abiding individual from possessing handguns and other firearms in the home, *full stop*. *See Heller*, 554 U.S. at 576, 635-636 (holding that the District of Columbia's "total ban on handguns, as well as its requirement that firearms in the *home* be kept nonfunctional even when necessary for self-defense" violated the Second Amendment) (emphasis added); *Id*. at 627 ("As we have said, the law totally bans handgun possession in the *home*.") (emphasis added).

134. Indeed, the Second Amendment "takes certain policy choices off the table [including] the absolute prohibition of *handguns* held and used for self-defense in the home." *Heller*, 554 U.S. at 636. (Emphasis added). As County Defendants and Fort Lee should know, "the American people have considered the handgun to be the quintessential self-defense weapon" and

"handguns are the most popular weapon chosen by Americans for self-defense in the home." *Id*. at 629. Among Aliaj's Seized Property were two handguns.

135. The State of New Jersey can't bar Aliaj from safely possessing handguns and other firearms in his home and neither can Defendants, regardless of the purported mental condition of family members and cohabitants.

136. When it comes to the home, banning peaceable, law-abiding citizens such as Aliaj from possessing firearms in this sacrosanct location is a policy choice that is "off the table."

137. It is beyond cavil that there is *no* historical tradition of prohibiting peaceable, law-abiding citizens such as Aliaj from possessing firearms in their homes. Therefore, Fort Lee and County Defendants cannot make an affirmative showing that any of their unlawful acts regarding Aliaj's firearms are part of any historical tradition of firearms regulation.

138. The prolonged constitutional violations and the Challenged Policies lack any constitutional, statutory, or regulatory basis. These infringements are nothing more than Defendants' ideological policy preferences.

139. County Defendants and Fort Lee deprived Aliaj of the Seized Aliaj Property for a prolonged period and subjected him to the full brunt of the Confiscation Policy, Revocation Policy, Compelled Sale Policy, and Compelled Production Policy, and did so intentionally and while acting under color of state law. In so doing, County Defendants and Fort Lee deprived Aliaj of his fundamental constitutional right to keep and bear arms in his home for over *seven months*, entirely inconsistent with any historic tradition of firearms regulation, and Aliaj has consequently been damaged for each day that the Seized Aliaj Property was withheld from him.

140.     As a direct and proximate result of the above violations of Aliaj's rights protected under the Second and Fourteenth Amendments, Aliaj has suffered an unlawful deprivation of his fundamental constitutional right to keep and bear arms.

141.     Accordingly, Aliaj is entitled to a declaration that County Defendants' and Fort Lee's confiscation and deprivation of the Seized Aliaj Property, and enforcement of the Confiscation Policy, Revocation Policy, Compelled Sale Policy, and Compelled Production Policy against him, violated his Second Amendment rights; an additional declaration that the Duty to Warn Law, the ERPO Act, and the Issuance Disqualifiers are each unconstitutional as applied to Aliaj; and an additional declaration that Directive 2019-2 and its variants and successor Directives are unconstitutional as applied to Aliaj.

142.     As well, Aliaj is entitled to his attorneys' fees and costs associated with this action.

### COUNT TWO
**Violation of the United States Constitution**
**Second & Fourteenth Amendments**
**(42 U.S.C. § 1983)**
**(Hroncich v. Paramus and County Defendants)**

143.     Hroncich repeats, realleges, and incorporates by reference every allegation of the foregoing paragraphs as if fully set forth in each claim for relief.

144.     Hroncich also brings his claim pursuant to 42 U.S.C. § 1983.

145.     Here, County Defendants and Paramus are unquestionably governmental entities and/or governmental actors, all subject to the Second Amendment.

146.     Hroncich's right to keep and bear arms was infringed when Defendants unlawfully enforced the Revocation Policy and the Denial Policy against him and then proceeded to extend what should have been at most a temporary constitutional infringement into a potentially permanent one by instigating a revocation proceeding against Hroncich.

29

147.    As a result, Hroncich was barred from exercising his fundamental right to keep and bear arms, including handguns, in his "*home*, where the need for defense of self, family, and property is *most acute*." *Heller*, 554 U.S. at 628 (emphases added).

148.    The State of New Jersey can't bar Hroncich from safely possessing handguns and other firearms in his home and neither can County Defendants and Paramus, regardless of the purported mental condition of family members and cohabitants.

149.    County Defendants and Paramus having adopted, enforced, implemented, and maintained the unlawful Revocation Policy and Denial Policy as to Hroncich, were undertaken intentionally and while acting under color of state law. In so doing, County Defendants and Paramus deprived Hroncich of his fundamental constitutional right to keep and bear arms in his home, entirely inconsistent with any historic tradition of firearms regulation, and Hroncich has consequently been damaged and irreparably harmed.

150.    Accordingly, Hroncich is entitled to a declaration that County Defendants' and Paramus's enforcement of the Revocation Policy and Denial Policy, and bringing arevocation proceeding against Hroncich, violated his Second Amendment rights; an additional declaration that the Duty to Warn Law, the ERPO Act, and the Issuance Disqualifiers are each unconstitutional as applied to Hroncich; and an additional declaration that Directive 2019-2 and its variants and successor Directives are unconstitutional as applied to Hroncich.

151.    As well, Hroncich is also entitled to his attorneys' fees and costs associated with this action.

**COUNT THREE**
**Violation of the United States Constitution**
**Second & Fourteenth Amendments**
**(42 U.S.C. § 1983)**
**(De La Cruz v. County Defendants and Rochelle Park)**

152.    De La Cruz repeats, realleges, and incorporates by reference every allegation of the foregoing paragraphs as if fully set forth in each claim for relief.

153.    De La Cruz also brings his claim pursuant to 42 U.S.C. § 1983.

154.    Here, County Defendants and Rochelle Park are unquestionably governmental entities and/or governmental actors, all subject to the Second Amendment.

155.    De La Cruz's right to keep and bear arms was infringed when Rochelle Park and County Defendants unlawfully enforced the Confiscation Policy, the Revocation Policy and the Denial Policy against him, and then proceeded to extend what should have been at most a temporary constitutional infringement into a potentially permanent one by failing to return his firearm.

156.    As a result, De La Cruz has been completely barred from exercising his fundamental right to keep and bear arms, including handguns, in his "*home*, where the need for defense of self, family, and property is *most acute*." *Heller*, 554 U.S. at 628 (emphases added).

157.    The State of New Jersey can't bar De La Cruz from safely possessing handguns and other firearms in his home and neither can County Defendants and Rochelle Park, regardless of the purported mental condition of family members and cohabitants.

158.    The ongoing constitutional violations and the Challenged Policies lack any constitutional, statutory, or regulatory basis. These infringements are nothing more than County Defendants' and Rochelle Park's ideological policy preferences.

159.    Rochelle Park and County Defendants having deprived De La Cruz of this firearm, and maintaining the Challenged Policies, were undertaken intentionally and while acting under color of state law. In so doing, Rochelle Park and County Defendants have deprived and continue to deprive De La Cruz of his fundamental constitutional right to keep and bear arms in his home,

31

entirely inconsistent with any historic tradition of firearms regulation, and De La Cruz has consequently been damaged and will be irreparably harmed each day that his firearm is withheld from him and the Challenged Policies to continue to be maintained and implemented.

160.    These violations inflict irreparable harm on De La Cruz. He has a substantial likelihood of success on the merits of his claim under the Second and Fourteenth Amendments, lacks an adequate remedy at law for this infringement on his fundamental right to keep and bear arms, and the harm that De La Cruz would suffer from denial of an injunction exceeds any legally cognizable harm an injunction may inflict upon County Defendants and Rochelle Park. The public interest favors enjoining both County Defendants' and Rochelle Park's deprivation of De La Cruz's Second Amendment rights and enjoining the Challenged Policies, requiring that County Defendants and Rochelle Park return the Seized De La Cruz Firearm to De La Cruz, and reinstate De La Cruz's FPIC.

161.    As a direct and proximate result of the above violations of De La Cruz's rights protected under the Second and Fourteenth Amendments, De La Cruz has suffered an unlawful deprivation of his fundamental constitutional right to keep and bear arms, and he will continue to suffer such an injury until granted the relief sought herein.

162.    Accordingly, De La Cruz is entitled to injunctive relief in the form of a preliminary injunction, and ultimately a permanent injunction, enjoining and County Defendants and Rochelle Park from destroying, selling, transferring, or otherwise disposing of the Seized De La Cruz Firearm; enjoining County Defendants and Rochelle Park from continuing and maintaining their unlawful possession of the Seized De La Cruz Firearm, and thus requiring that County Defendants and Rochelle Park immediately return the Seized De La Cruz Firearm to De La Cruz; and directing

County Defendants and Rochelle Park to reinstate De La Cruz's FPIC, all to protect De La Cruz against the irreparable harm of ongoing deprivation of his Second Amendment rights.

163. De La Cruz is also entitled to a declaration that County Defendants' and Rochelle Park's continued confiscation and deprivation of the Seized De La Cruz Firearm, and adoption, implementation, enforcement, and maintenance of the Challenged Policies, violate his Second Amendment rights; an additional declaration that the Duty to Warn Law, the ERPO Act, and the Issuance Disqualifiers are each unconstitutional as applied to De La Cruz; and an additional declaration that Directive 2019-2 and its variants and successor Directives are unconstitutional as applied to De La Cruz.

164. As well, De La Cruz is also entitled to his attorneys' fees and costs associated with this action.

## JURY DEMAND

165. Plaintiffs hereby demand trial by jury.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

(a) On Count One, declaratory relief in favor of Aliaj and against County Defendants and Fort Lee as set forth in this Amended Complaint;

(b) On Count One, compensatory and/or nominal damages in favor of Aliaj and against County Defendants and Fort Lee for the deprivation of Aliaj's fundamental rights;

(c) On Count One, punitive damages in favor of Aliaj and against the County Defendants;

(d)     On Count One, Aliaj's attorneys' fees and costs associated with this action pursuant to 42 U.S.C. § 1988;

(e)     On Count Two, declaratory relief in favor of Hroncich and against County Defendants and Paramus as set forth in this Amended Complaint;

(f)     On Count Two, compensatory and/or nominal damages in favor of Hroncich and against County Defendants and Paramus for the deprivation of Hroncich's fundamental rights;

(g)     On Count Two, punitive damages in favor of Hroncich and against the County Defendants;

(h)     On Count Two, Hroncich's attorneys' fees and costs associated with this action pursuant to 42 U.S.C. § 1988;

(i)     On Count Three, declaratory relief in favor of De La Cruz and against County Defendants and Rochelle Park as set forth in this Amended Complaint;

(j)     On Count Three, injunctive relief in favor of De La Cruz and against County Defendants and Rochelle Park as set forth in this Amended Complaint

(k)     On Count Three, compensatory and/or nominal damages in favor of De La Cruz and against County Defendants and Rochelle Park for the deprivation of De La Cruz's fundamental rights;

(l)     On Count Three, compensatory damages in favor of De La Cruz and against County Defendants and Rochelle Park for lost wages and earning opportunities;

(m)     On Count Three, punitive damages in favor of De La Cruz and against the County Defendants;

(n)     On Count Three, De La Cruz's attorneys' fees and costs associated with this action pursuant to 42 U.S.C. § 1988; and

(o)     Any other and further relief as the Court deems just and proper.

Dated: June 1, 2026

                                    Respectfully submitted,

                                    /s/ Edward Andrew Paltzik
                                    Edward Andrew Paltzik
                                    (Bar No. 251582017)
                                    **TAYLOR DYKEMA PLLC**
                                    914 E. 25th Street
                                    Houston, TX 77009
                                    Tel: 516-526-0341
                                    edward@taylordykema.com

                                    *Attorneys for Plaintiffs Elsid Aliaj, Luis
                                    Rene De La Cruz Franco, and Martin
                                    Hroncich*