**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **ELSID ALIAJ;** | § | |
| **MARTIN HRONCICH; AND** | § | **HON. ESTHER SALAS, U.S.D.J.** |
| **LUIS RENE DE LA CRUZ FRANCO,** | § | **Hon. Michael A. Hammer, U.S.M.J.** |
| **PLAINTIFFS,** | § | |
| | § | |
| **V.** | § | **<u>CIVIL ACTION</u>** |
| | § | |
| **BERGEN COUNTY PROSECUTOR'S** | § | **CASE NO. 2:25-CV-17131 (ES) (MAH)** |
| **OFFICE; MARK MUSELLA, in his** | § | |
| **official capacity as Bergen County** | § | |
| **Prosecutor;** | § | |
| **BOROUGH OF FORT LEE;** | § | |
| **BOROUGH OF PARAMUS; AND** | § | **MOTION DATE: SEPTEMBER 21, 2026** |
| **TOWNSHIP OF ROCHELLE PARK,** | § | |
| **DEFENDANTS.** | § | |

---

**PLAINTIFFS' COMBINED OPPOSITION TO**
**<u>DEFENDANTS' MOTIONS TO DISMISS</u>**
**[Dkts. 44, 49, 53, 54]**

---

# TABLE OF CONTENTS

Table of Authorities ........ i

Summary of Defendants' Arguments ........ 2

Factual Background ........ 3

Legal Standards ........ 18

Argument ........ 20

This Case Presents a Justiciable Controversy and Defendants' Return of Aliaj's Property Does Not Moot the Case ........ 20

The Eleventh Amendment Does Not Bar These Claims ........ 27

Defendants Are Amenable To Claims For Declaratory and Injunctive Relief ........ 32

Conclusion ........ 35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Antonelli v. New Jersey*, 310 F. Supp. 2d 700 (D.N.J. 2004) .................................33

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................19

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................19

*Bistrian v. Levi*, 696 F.3d 352 (3d Cir. 2012) .................................20

*Chey v. LaBruno*, 608 F. Supp. 3d 161 (D.N.J. 2022) .................................24

*Coleman v. Kaye*, 87 F.3d 1491 (3d Cir. 1996) .................................30, 31

*Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347 (3d Cir. 2014) .........18

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................................31, 32

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022) ................21

*Englewood Hospital & Medical Center v. State*, 261 N.J. 195 (2025) .............22, 23

*Estate of Lagano v. Bergen County Prosecutor's Office*, 769 F.3d 850 (3d Cir. 2014) .................................31

*Ex parte Young*, 209 U.S. 123 (1908) .................................32, 33, 34

*Febres v. Camden Board of Education*, 445 F.3d 227 (3d Cir. 2006) ....................30

*Fields v. Speaker of the Pennsylvania House of Representatives*, 936 F.3d 142 (3d Cir. 2019) .................................21

*First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304 (1987) .................................23

*Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655 (3d Cir. 1989) .................................29

*Fort v. United States*, 712 F. Supp. 3d 575 (D.N.J. 2024) .................................18

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) .................................... 19

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000) ........................................................................... 22

*Galette v. New Jersey Transit Corp.*, 607 U.S. 509 (2026) .................................... 28

*Hamilton v. Bromley*, 862 F.3d 329 (3d Cir. 2017) ................................................ 25

*Hartnett v. Pennsylvania State Education Ass'n*, 963 F.3d 301 (3d Cir. 2020) 21, 22

*In re Brown*, 244 B.R. 62 (Bankr. D.N.J. 2000) ...................................................... 30

*Karns v. Shanahan*, 879 F.3d 504 (3d Cir. 2018) .................................................... 30

*Knick v. Township of Scott*, 588 U.S. 180 (2019) .................................................... 23

*Lara v. Commissioner Pennsylvania State Police*, 125 F.4th 428 (3d Cir. 2025) ..................................................................................... 24, 25

*Lincoln County v. Luning*, 133 U.S. 529 (1890) ...................................................... 28

*Littman v. Gimello*, 115 N.J. 154 (1989) ................................................................. 22

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................................................ 31

*Mendez v. Westminster School District*, 64 F. Supp. 544 (S.D. Cal. 1946), *aff'd*, 161 F.2d 774 (9th Cir. 1947) (en banc) ............................................... 32

*Merritts v. Richards*, 62 F.4th 764 (3d Cir. 2023) .................................................. 33

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) ............................. 29

*Mortensen v. First Federal Savings & Loan Ass'n*, 549 F.2d 884 (3d Cir. 1977) ........................................................................................... 19

*Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977) ........................................................................................... 28

*Murphy v. Middlesex County*, No. 15-7102 (FLW), 2017 WL 6342154 (D.N.J. Dec. 12, 2017) ............................................................................ 31

*New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) .................... 31, 32

*Northern Insurance Co. of New York v. Chatham County*, 547 U.S. 189 (2006) ........................................................................................28

*Rhodes v. Stewart*, 488 U.S. 1 (1988) (per curiam)..............................................21

*Roe v. Wade*, 410 U.S. 113 (1973) .........................................................................20

*Save Long Beach Island v. U.S. Department of Commerce*, 721 F. Supp. 3d 317 (D.N.J. 2024)...........................................................................................25

*Virginia Office for Protection & Advocacy v. Stewart*, 563 U.S. 247 (2011)...33, 34

*Will v. Michigan Department of State Police*, 491 U.S. 58 (1989) .........................33

**Constitutional Provisions**

U.S. Const. amend. II ...............................................................................passim

U.S. Const. amend. V ........................................................................22, 23, 24

U.S. Const. amend. XI...........................................................27, 28, 29, 30, 32, 33

U.S. Const. amend. XIV ..................................................................................1

N.J. Const. art. I, ¶ 20...............................................................................22, 23

**Statutes**

42 U.S.C. § 1983 ...................................................................................29, 31, 33

N.J.S.A. 2A:62A-16.1 ...........................................................................................7, 14

N.J.S.A. 2C:25-21 ....................................................................................................26

N.J.S.A. 2C:58-3 ..............................................................................11, 12, 15, 16

N.J.S.A. 2C:58-20 to -32 ..........................................................................................15

N.J.S.A. 2C:58-23 ....................................................................................................25

N.J.S.A. 2C:58-24 ....................................................................................................25

**Rules**

Fed. R. Civ. P. 12(b)(1) ........................................................................................2, 18

Fed. R. Civ. P. 12(b)(6) .......... 2, 3

**Secondary Authorities**

2 Federal Civil Rights Acts § 14:80 (3d ed.) .......... 29

66 A.L.R. Fed. 285 (1984) .......... 26

Plaintiffs'[1] claims seek to vindicate constitutional injuries under the Second and Fourteenth Amendments sustained at the hands of the Defendants. As explained in detail in Plaintiffs' First Amended Complaint [Dkt. 32] ("FAC"), Defendants[2] have enacted and enforced upon Plaintiffs a pattern and practice of disarming individuals, including firearm confiscation, and revocation of firearm related permits, based upon the perceived prohibited status of those individuals' family members or cohabitants. Defendants' have brought a series of Motions to Dismiss[3] largely on the grounds that Plaintiffs lack standing, their claims are moot, or Defendants are immune from the relief requested in this action. For the reasons set forth below, these arguments are unpersuasive and the motions should be denied. At this early phase in the proceedings, Plaintiffs have pled plausible constitutional injuries that warrant the Court's consideration.

---

[1] "Plaintiffs" refers collective to Elsid Aliaj ("Aliaj"), Martin Hroncich ("Hroncich"), and Luis Rene De La Cruz Franco ("De La Cruz").

[2] "Defendants" refers collectively to the Bergen County Prosecutor's Office ("BCPO"), Mark Musella ("Musella"), the Borough of Fort Lee ('Fort Lee"), the Borough of Paramus ("Paramus"), and the Township of Rochelle Park ("Rochelle Park"). BCPO and Musella may be jointly referred to as "County Defendants."

[3] As suggested in Dkt. 52, Plaintiffs are filing a single brief in opposition to each of Defendants' Motions to Dismiss ("MtD"), including Fort Lee's MtD (Dkt. 44), Paramus's MtD (Dkt. 49), BCPO's MtD (Dkt. 53), and Rochelle Park's MtD (Dkt. 54). When referring to an individual Defendants' MtD, Plaintiffs will refer to them as "Fort Lee's Brief" (Dkt. 44-1), "Paramus's Brief" (Dkt. 49-3), "BCPO's Brief" (Dkt. 53-2), and "Rochelle Park's Brief" (Dkt. 54-1), or Plaintiffs will cite them by their Docket number. References to "Defendants' Briefs" are references to arguments that appear in all Defendants' Briefs.

Defendants have failed to articulate a cognizable basis for dismissal under either Federal Rule of Civil Procedure (12)(b)(1) or (12)(b)(6). Rather, Defendants have proffered debunked or inapplicable arguments that are distinguishable or simply legally incorrect. As explained more fully below, if the arguments contained therein were correct, citizens would be foreclosed from ever challenging any New Jersey licensing authority's or municipality's actions regarding the Second Amendment in this Court. Plaintiffs respectfully urge this Court to deny Defendants' Motions and allow this case to proceed. In the alternative, if this Court finds that the First Amended Complaint lacks sufficient factual allegations for any claim, then Plaintiffs respectfully request leave to submit a Second Amended Complaint to correct whatever issues this Court finds.

## SUMMARY OF DEFENDANTS' ARGUMENTS

To facilitate responding to Defendants' various Motions in a single brief, the topics of argument are grouped as follows:[4]

1. Defendants argue that they are immune from suit because of sovereign immunity. *See* Dkt. 44-1 at 9-12; 53-2 at 15-21; Dkt. 54-1 at 12-15. While some Defendants may enjoy certain levels of immunity, any such immunity does not bar these claims.
2. Defendants argue that Aliaj's claims are moot because his property was eventually returned. *See* Dkt. 53-2 at 9-15. But his firearms were only returned as this litigation loomed. Despite the voluntary cessation of the

[4] The arguments herein do not address Hroncich, as we will not be arguing against the Motions with respect to him.

violation once counsel was involved, the months long deprivation his Second Amendment rights still constitutes a violation worthy of damages and declaratory relief. Furthermore, as explained below, Aliaj faces an ongoing likelihood of the violation of his rights, which is not remedied simply by closing his case. The conduct the occurred here is capable of repetition yet evading review.

3. Defendants argue that this Court lacks authority to issue declaratory and injunctive relief against them. *See* Dkt. 53-2 at 18-21. But declaratory and injunctive relief is one of the primary components of the litigation of constitutional rights. Defendants' status as state entities does not deprive this Court of the ability to issue declaratory and injunctive relief.

Defendants also assert that Plaintiffs' claims do not meet the requirements of Rule 12(b)(6), however, those arguments are then based on the three issues outlined above. *See* Dkt. 44-1 at 2-3; Dkt. 53-2 at 24-30; Dkt. 54-1 at 4-6. Because Defendants' Rule 12(b)(6) arguments rely on the three issues outlined above, Plaintiffs do not address Rule 12(b)(6) separately herein but instead address the arguments on which Defendants rely.

## FACTUAL BACKGROUND

Plaintiffs' claims arise from the confiscation of their constitutionally protected firearms, and the attempted and purported revocation of their firearm-related permits. Although their claims are based on separate facts, they are the result of the same wrongful Challenged Policies and actions of the Defendants. Although Plaintiffs' claims are more thoroughly described in the FAC, their claims can be summarized as follows:

***<u>Aliaj (FAC ¶¶ 28-68)</u>***

On April 17, 2025, the Fort Lee Police Department ("FLPD") confiscated Aliaj's firearms, ammunition, and related accessories from his home based on a report from the Englewood Police Department ("EPD") that Aliaj's wife ("L.A.") had been involuntarily admitted to New Bridge Medical Center for a mental health evaluation. The alleged mental health incident turned out to be a language-related misunderstanding, resulting in L.A.'s discharge with a diagnosis of "Adjustment disorder with depressed mood Seven weeks pregnant." In fact, as was ultimately confirmed by her medical providers, L.A. did not want to harm herself and was not a threat to herself or others.

Later that evening, at about 8:45 p.m., Officer Iacovo of the EPD contacted FLPD headquarters and advised that the EPD had taken L.A. to New Bridge Medical Center and had conducted a computer search of Aliaj's registered firearms.

At approximately 9:30 p.m., Detective Sergeant D. Tropea and Police Officer J. Perez of FLPD arrived at Aliaj's home, where he and L.A. reside together. Consistent with the Confiscation Policy, Sergeant Tropea and Officer Perez, without presenting any warrant or other court order, instructed Aliaj to surrender his firearms because of L.A.'s involuntary admission. Although bewildered by the illegal demand, Aliaj, believing he would be arrested if he did

not comply, had no choice but to cooperate. Accordingly, he surrendered his firearms, ammunition, and related accessories to Sergeant Tropea and Officer Perez.

On April 21, 2025, L.A. was discharged with a diagnosis of "Adjustment disorder with depressed mood" and a note that she was "Seven weeks pregnant." Moreover, L.A.'s medical records contain the following notation under an entry entitled "Hospital Course": "As patient's acute symptoms resolved since admission she was not presenting acutely anxious depressed suicidal or psychotic she did not meet the criteria for continued inpatient psychiatric hospitalization and was discharged back to the care of husband . . ." (Emphasis added). Additionally, a notation under an entry entitled "Suicidal and Self Injurious Behavior" states "none reported" for each category.

From the time his firearms, ammunition, and related accessories were improperly confiscated pursuant to the Confiscation Policy, Fort Lee, as required by County Defendants, maintained continuous possession of the Seized Aliaj Property, consistent with the Confiscation Policy, until Fort Lee and County Defendants agreed to return the Seized Aliaj Property to Aliaj's rightful possession on December 12, 2025—over seven months after his property was improperly confiscated—and under threat of this lawsuit.

Aliaj has a gun safe, which only he can open. Aliaj immediately locked his firearms in his gun safe, restricting access to anyone besides himself.

On April 26, 2025, Aliaj emailed BCPO (as FLPD had instructed him) regarding the return of his firearms. Amy West of BCPO advised him that, because his wife had been committed, BCPO would not agree to the return, so his options were to store the guns offsite, sell them, destroy them, or have a hearing. When he indicated that he wanted a hearing, she informed him that the hearing would not take place before September.

On May 28, 2025, Aliaj wrote again indicating that he had never received any paperwork and asking for an ERPO, TERPO, or any other applicable paperwork. BCPO responded that there was no ERPO and that paperwork would be supplied when the motion for the hearing was filed.

At this point, Aliaj, having reflected further, now understood that he was facing an obvious ongoing violation of his constitutional rights. He replied: “Hi Amy thanks for the prompt response. Is there a TERPO? Under what legal statute [sic], grounds, procedure were they confiscated?”

As the Seized Aliaj Property was legally owned by Aliaj, not L.A., Aliaj sought to utilize statutory provisions that provide a mechanism for a disarmed individual to expeditiously recover their firearms which were confiscated due to another individual triggering the duty to warn law.

Accordingly, on June 23, 2025, Aliaj emailed BCPO a demand pursuant to N.J.S.A. 2A:62A-16.1.e, informing BCPO of his gun safe, which L.A. did not have access to, and requesting the immediate return of his firearms and ammunition, which, upon their return, would be securely stored in said safe.

Although the statute does not provide any discretion to reject such a request, BCPO ignored Aliaj. When no response was forthcoming, and fully aware that Fort Lee and County Defendants were violating his rights, Aliaj emailed BCPO on June 26, 2025, and asked when he could pick up his property. BCPO, consistent with the Confiscation Policy, informed him that the case was still pending and that he could not pick up anything.

Aliaj's fruitless and futile communications with BCPO continued into July. On July 17, 2025, BCPO insisted that Aliaj provide L.A.'s medical records so that BCPO could determine that she was not a danger. In that email, consistent with the Confiscation Policy, Revocation Policy, Denial Policy, and the Compelled Production Policy, BCPO informed Aliaj that if he did not agree, then BCPO would file a motion to revoke his FPIC and also file a motion for L.A.'s medical records. On July 23, 2025, faced with BCPO's illegal threats, Aliaj initially agreed to provide L.A.'s medical records.

After consulting with counsel, however, Aliaj realized that he was legally entitled to the return of the Seized Aliaj Property irrespective of the contents of

L.A.'s medical records, and that BCPO had no legal basis to condition the possible return of the Seized Aliaj Property on Aliaj's furnishing of L.A.'s medical records. Aliaj also realized that County Defendants had no legal authority to compel him to produce his wife's medical records, as this was entirely inconsistent with well-established law relating to patient privacy and patient control over medical records. Accordingly, Aliaj decided not to provide the medical records in the face of Aguirre's coercion.

On September 11, 2025, undersigned counsel emailed BCPO and inquired into the legal basis for the County Defendants' actions. BCPO, consistent with the Confiscation Policy and the Compelled Production Policy, replied the BCPO has safety concerns but that obtaining L.A.'s medical records might assuage their concerns. BCPO's response was telling in that it was unable to invoke any legal authority for confiscating Aliaj's firearms; because there is no such authority. The only "authority" that BCPO provided was the "State's concerns," which is not a legally recognized basis to confiscate and retain a citizen's firearms and ammunition, nor to revoke a FPIC.

When undersigned counsel continued to press Aguirre for a legal citation in further email and verbal communications, rather than continuing to discuss the situation in good faith, BCPO enforced the Revocation Policy by initiating a bad-faith, retaliatory proceeding without explanation or warning. Pursuant to their

Revocation Policy, County Defendants sought not only to revoke Aliaj's FPIC, but also to compel the production of L.A.'s mental health and psychiatric records pursuant to their Compelled Production Policy, and to compel the sale of Aliaj's firearms pursuant to their Compelled Sale Policy. County Defendants had no legal authority to ransom Aliaj's firearms and ammunition in exchange for intrusion into L.A.'s private medical affairs, nor was Aliaj legally required to comply with such a demand.

As a result, Aliaj endured a prolonged deprivation and violation of his constitutional right to bear arms. And, when he challenged that deprivation and violation, he faced retaliation from BCPO.

On December 11, 2025, County Defendants—after failing to invoke any legal authority for confiscating the Seized Aliaj Property, despite being repeatedly and respectfully asked to do so by the undersigned counsel—withdrew their pending motions.

On December 12, 2025, Aliaj, retrieved his property from the FLPD headquarters with the reluctant consent and knowledge of the unapologetic County Defendants.

The County Defendants' brazen enforcement of various Challenged Policies against Aliaj, followed by their hasty withdrawal of the revocation proceeding against Aliaj and reluctant return of the Seized Aliaj Property, clearly demonstrates

that the Challenged Policies exist, that County Defendants know the Challenged Policies are illegal, and that County Defendants only relax enforcement of the Policies when they are sued, and only for individuals who undertake the substantial time and effort, and expend the resources, to sue.

***De La Cruz (FAC ¶¶ 78-102)***

On or about December 5, 2026, De La Cruz's then 11-year-old son (S.D.) was involved in a misunderstanding related to a social media communication with a fellow student that caused school staff to mistakenly believe S.D. intended to cause harm to the other student. His mental health provider eventually confirmed that S.D. did not intend to harm the student and did not represent a threat to himself or others.

The Rochelle Park Police Department ("RPPD") obtained a TERPO against S.D. (and not against De La Cruz) under the ERPO Act. And at approximately 12:15 a.m. on December 6, 2024, two RPPD officers arrived at De La Cruz's home, where he and S.D. reside together, requesting to speak with S.D. The RPPD officers interrogated De La Cruz about the location of his firearm, which was secured in a safe located in his upstairs master bedroom. At the time, he was unaware of any TERPO and remained unaware of any TERPO until May 29, 2026.

De La Cruz, afraid of what RPPD might do to him if he refused, reluctantly agreed, at which point the RPPD officers accompanied De La Cruz to his bedroom,

where they subsequently asked De La Cruz to unlock his safe. Pursuant to the Confiscation Policy, and without presenting any warrant or other court order, the RPPD officers instructed De La Cruz to surrender his firearm for “one or two days,” until the matter involving the misunderstood communication between S.D. and his schoolmate was sorted out.

Although bewildered by this sudden and illegal demand, De La Cruz, believing he could be arrested or physically harmed if he refused, had no choice but to cooperate and comply with the Confiscation Policy. So, he surrendered his firearm.

On a December 9, 2024, a social worker assigned to S.D. issued an opinion letter to the school guidance counsellor, which stated that she “completed a school clearance assessment for [S.D.], along with his father, Luis De La Cruz” and that “[a]t this time, [S.D.] does not present as a danger to himself or others and therefore is cleared to return to school.”

On December 6, 2024, De La Cruz’s FPIC—which had previously been valid since its approval on July 15, 2024—was post-facto denied by Rochelle Park, consistent with the Denial Policy and the Revocation Policy.

Rochelle Park elected to enforce County Defendants’ Denial Policy and Revocation Policy by flagrantly disregarding the revocation procedure established by N.J.S.A. 2C:58-3(f), which mandates in pertinent part that “upon the application

of the county prosecutor of any county," or "the chief police officer of any municipality," an FPIC "may be revoked by the Superior Court of the county wherein the card was issued ***after hearing upon notice, upon a finding that the holder thereof no longer qualifies for the issuance of the permit***" (emphasis added).

By effectuating the post-facto denial of De La Cruz's FPIC—which had already been approved and valid for over four months—Rochelle Park and County Defendants subverted the revocation procedure established by N.J.S.A. 2C:58-3(f), one which would have afforded De La Cruz notice and a hearing.

Rochelle Park and County Defendants carried out their ill-contrived, extrajudicial, and unlawful post-facto denial of De La Cruz's FPIC in the absence of any notice to De La Cruz, and in the absence of any valid court order or proceeding.

Consistent with the Confiscation Policy and illegally relying at least in part on the TERPO issued against S.D., Rochelle Park officials, aided by County Defendants, have maintained continuous possession of De La Cruz's firearm since it was improperly confiscated on December 6, 2024.

De La Cruz's numerous attempts to contact Rochelle Park officials via phone and email to obtain an update on the status of his FPIC and his firearm went

completely and totally unanswered. Thus, the ongoing deprivation and violation of De La Cruz's constitutional right to bear arms continues.

Moreover, because of the ongoing deprivation and violation of his constitutional right to bear arms at the hands of Rochelle Park and County Defendants, De La Cruz has been forced to forfeit a new job serving as a SORA-licensed armed commercial driver, which requires prospective employees to maintain a valid FPIC.

On May 29, 2026, County Defendants—after failing to invoke any legal authority for confiscating the Seized De La Cruz Firearm other than the TERPO against S.D., and continuing to try and cover their tracks before the amendment of this lawsuit, presented a draft "Consent Order" to De La Cruz and asked him to sign it in exchange for the return of the Firearm.

But the Consent Order, rather than being a good faith offer to restore De La Cruz's Second Amendment rights, was a disingenuous attempt to get De La Cruz to ransom the De La Cruz Firearm in exchange for a release from liability, without the benefit of counsel. De La Cruz did not sign the Consent Order because it falsely stated that he had "voluntarily" surrendered his firearm and purported to release County Defendants by referring to the conclusion of "all" related proceedings.

County Defendants' brazen enforcement of various Challenged Policies against De La Cruz, followed by their sudden illusory offer to return the Seized De La Cruz Firearm mere days before the publicly known amendment deadline for this lawsuit, demonstrates that the Challenged Policies exist, that County Defendants know the Challenged Policies are illegal, and that County Defendants only relax enforcement of the Policies when they are sued.

***<u>Laws and Directives Invoked by Defendants (FAC ¶¶ 4-5, 12, 103-123)</u>***

Defendants rely on the following laws, Directives, and Challenged Policies to justify their actions.

Under the Duty to Warn Law, health care professionals have a "duty to warn and protect" where a patient has communicated "a threat of imminent, serious physical violence against a readily identifiable individual or against himself" or where the practitioner believes that "the patient intended to carry out an act of imminent, serious physical violence against a readily identifiable individual or against himself." N.J.S.A. 2A:62A-16.1.b(1), (2). They are also required to notify law enforcement of such imminent danger and to provide the identity of the patient. The patient can be compelled to surrender their firearms, and their firearms purchaser identification card ("FPIC") can be voided. N.J.S.A. 2A:62A-16.1.e. With respect to seizure of firearms, the duty to warn law only applies to the patient who is the subject of the report and the firearms they have access to, but it does *not*

apply to the firearms of family members or co-habitants which the patient does not have access to. Moreover, the surrender of firearms under the duty to warn law requires a court order.

In addition to the Duty to Warn Law, New Jersey is one of the minority of states that has a so-called "red flag law" ("ERPO") pursuant to which a civil court can issue of a warrant (a) directing the respondent named in the petition to immediately surrender to law enforcement all firearms and ammunition owned or otherwise possessed by the respondent, and (b) prohibiting the respondent from purchasing or possessing firearms or ammunition for a prescribed period of time. N.J.S.A. 2C:58-20-32. Under the ERPO Act, firearms and ammunition are confiscated pursuant to ERPOs and TERPOs.

At no time have Plaintiffs been the subject of an ERPO or a TERPO. And, as alleged in the FAC, the only cohabitant who was the subject of a TERPO was De La Cruz's minor child, S.D. Furthermore, none of the Defendants, nor any private citizens, filed a petition against Plaintiffs under the ERPO Act.

Defendants also relied on the Issuance Disqualifiers[5] to enforce their Challenged Policies:

(i) N.J.S.A. 2C:58-3(c)(3), which prohibits the issuance of an FPIC or permit to purchase a handgun to "any person who suffers from physical defect or disease which would make it unsafe for that person

[5] N.J.S.A. 2C:58-3(c)(3), N.J.S.A. 2C:58-3(c)(5), and N.J.S.A. 2C:58-3(c)(13) collectively, the "Issuance Disqualifiers"

to handle firearms, to any person with a substance use disorder unless any of the foregoing persons produces a certificate of a medical doctor, treatment provider, or psychiatrist licensed in New Jersey, or other satisfactory proof, that the person no longer has that particular disability in a manner that would interfere with or handicap that person in the handling of firearms";

(ii) N.J.S.A. 2C:58-3(c)(5), which prohibits the issuance of an FPIC to "any person where the issuance would not be in the interest of the public health, safety, or welfare because the person is found to be lacking the essential character of temperament necessary to be entrusted with a firearm";

(iii) N.J.S.A. 2C:58-3(c)(13) prohibits issuance of an FPIC to any person that has been voluntarily admitted to inpatient treatment or involuntarily committed to inpatient or outpatient treatment, unless the court has expunged the person's record.

Defendants cited, invoked, and relied upon one or more of the Issuance Disqualifiers against each of the Plaintiffs, even though none of the Issuance Disqualifiers were applicable to any of the Plaintiffs, but *at most* only applicable to their cohabitants.

Moreover, in Aliaj's case, and upon information and belief in many other instances including against De La Cruz, BCPO lawlessly cited, invoked, or relied on the "State's concerns" or variants thereof.

County Defendants have also reduced some aspects of the Challenged Policies to writing, in the process demonstrating their authority over the Borough Defendants on matters of firearms regulation.

For example, on February 5, 2019, BCPO issued "Bergen County Prosecutor's Office Law Enforcement Directive No. 2019-2" ("Directive 2019-2")

to "All Bergen County Chiefs of Police, Police Directors, Officers-In-Charge, and Sheriff" which was meant to supplement the so-called "Bergen County Prosecutor's Office Law Enforcement Directive No. 2018-5." Both Directives related to enforcement of the Duty to Warn Law. Under Directive 2019-2, citizens such as Aliaj and De La Cruz do not have any legitimate option to refuse consent to seizure of their firearms, since, under Directive 2019-2, law enforcement must seek a warrant if consent is denied. County Defendants have interpreted Directive 2019-2 as broadly as possible to effectuate the Challenged Policies, expanding the reach of the Directive to include firearms owners who live with the purportedly disqualified cohabitants.

County Defendants have adopted, implemented, enforced, and maintained a series of related policies that together deprive individuals under County Defendants' jurisdiction, from exercising their fundamental rights under the Second Amendment, not premised upon any allegation that Plaintiffs themselves are prohibited, but rather by association with a cohabitant who is so prohibited or otherwise disqualified, or by association with a cohabitant who County Defendants perceive to be so prohibited or otherwise disqualified.

Those Challenged Policies include: (a) Confiscation of firearms, ammunition, and related accessories based solely on one or more Cohabitant Disqualifications (the "Confiscation Policy"); (b) Compelled sales of firearms,

ammunition, and related accessories based solely on one or more Cohabitant Disqualifications (the "Compelled Sale Policy"); (c) Revocation of Firearms Purchaser Identification Card ("FPIC") or other firearms licenses or permits validly issued under the laws of New Jersey based solely on one or more Cohabitant Disqualifications (the "Revocation Policy"); (d) Denial of applications for FPICs or other firearms licenses or permits that would otherwise be validly issued under the laws of New Jersey based solely on one or more Cohabitant Disqualifications (the "Denial Policy"); and (e) Compelled production of cohabitant medical records based solely on one or more Cohabitant Disqualifications (the "Compelled Production Policy").

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(1), a court must dismiss a complaint if it lacks subject matter jurisdiction. The party asserting federal jurisdiction bears the burden of demonstrating that the case falls within the court's jurisdiction. *Fort v. United States*, 712 F. Supp. 3d 575 (D.N.J. 2024). In the Third Circuit, a district court must first determine whether a Rule 12(b)(1) motion presents a facial attack or a factual attack on the claim, because that distinction determines how the pleading must be reviewed. *Const. Party Pennsylvania v. Aichele*, 757 F.3d 347 (3d Cir. 2014). This foundational distinction was established

by the Third Circuit in *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884 (3d Cir. 1977), and has been consistently applied by this District.

The Third Circuit synthesized the *Twombly*/*Iqbal* framework in *Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009). After *Iqbal*, when presented with a motion to dismiss for failure to state a claim, district courts conduct a two-part analysis. First, the factual and legal elements of a claim should be separated—the court must accept all of the complaint's well-pleaded facts as true but may disregard any legal conclusions. Second, the court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. *Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009). In other words, a complaint must set out sufficient factual matter to show that the claim is facially plausible, after accepting the alleged facts as true and drawing all reasonable inferences from those facts.

Some courts within the Third Circuit have articulated this as a three-step process: (1) the court must take note of the elements a plaintiff must plead to state a claim; (2) the court should identify and peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth; and (3) where there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Bistrian v. Levi*, 696 F.3d 352 (3d Cir. 2012). This last step is a context-

specific task that requires the reviewing court to draw on its judicial experience and common sense. *Id.*

## ARGUMENT

Defendants' arguments go too far. If their defenses were as Defendants actually assert, then citizens of New Jersey would never be able to seek redress against licensing authorities or law enforcement in this Court for violations of their Second Amendment rights. Defendants actions here resulted in the violation of Plaintiffs' Second Amendment rights through the confiscation of their lawful firearms and the attempted and purported revocation of their firearm-related permits under the color of law and over misinterpretations of innocent statements by individuals cohabiting with Plaintiffs.

### ***This Case Presents a Justiciable Controversy and Defendants' Return of Aliaj's Property Does Not Moot the Case***

At the outset, it should be noted that De La Cruz's property still has not be returned to him, so the Second Amendment violations perpetrated against him are ongoing. *See* FAC ¶¶ 99-102.

Defendants' standing and mootness arguments rely on the same reasoning that was used for decades in the context of abortion litigation, but those arguments do not reflect Second Amendment law. *See*, *e.g.*, *Roe, et al. v. Wade*, 410 U.S. 113, 124 (1973) (recounting appellee's argument that the women lacked standing

because they were no longer pregnant), *overturned on other grounds, Dobbs, et al. v. Jackson Women's Health Org., et al.*, 597 U.S. 215 (2022).

Defendants argue that Aliaj's case is moot because his property was returned *after* he initiated this lawsuit. Essentially, Defendants argue that because they voluntarily ceased their wrongful conduct towards Aliaj, they have rendered the case moot. It is well established, however that "[v]oluntary cessation does not always trigger mootness." *Hartnett v. Pennsylvania State Educ. Ass'n*, 963 F.3d 301, 306 (3d Cir. 2020).

In *Hartnett*, the Third Circuit explained, "[o]ne scenario in which we are reluctant to declare a case moot is when the defendant argues mootness because of some action it took unilaterally after the litigation began. This situation is often called '[v]oluntary cessation,' and it 'will moot a case only if it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* (quoting *Fields v. Speaker of the Pa. House of Representatives*, 936 F.3d 142, 161 (3d Cir. 2019). The Third Circuit further expounded, "[w]hen a plaintiff seeks declaratory relief, a defendant arguing mootness must show that there is no reasonable likelihood that a declaratory judgment would affect the parties' future conduct." *Id.* (citing *Rhodes v. Stewart*, 488 U.S. 1, 4 (1988) (per curiam).

"[O]nce the plaintiff shows standing at the outset [of the case], she need not keep doing so throughout the lawsuit. Instead, the burden shifts. If the defendant

(or any party) claims that some development has mooted the case, it bears the 'heavy burden of persua[ding]' the court that there is no longer a live controversy." *Id.* at 306. In Hartnett, the Third Circuit observed that "[v]oluntary cessation cases highlight the important difference between standing (at the start of a suit) and mootness (mid-suit). The shift in the burden of proof from plaintiff to defendant matters. It means that sometimes, 'the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness.'" *Id.* (quoting *Friends of the Earth*, *Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)).

Here, Defendants have not come close to meeting their "heavy burden" of demonstrating that NAME's case is moot due to their voluntary cessation of the unlawful conduct alleged after this case was initiated. "What [is] important [is] whether the [Defendants] could reasonably be expected to engage in the challenged behavior again." *Id.* "That is always the key question" and the Third Circuit "will understandably be skeptical of a claim of mootness when a defendant yields in the face of a court order and assures us that the case is moot because the injury will not recur yet maintains that its conduct was lawful all along." *Id. Hartnett* perfectly elucidates the problematic nature of Defendants' argument that the case is moot due to their voluntary cessation of the challenged conduct. Because Defendants cannot show that Aliaj lacked standing at the inception of the suit, or that the case

has been rendered moot due to their voluntary cessation of the unlawful conduct, the Motion should be dismissed.

Courts have made clear that even a temporary violation of an individual's constitutional rights is actionable. For example, the New Jersey Constitution provides that private property shall not be taken for public use without just compensation. *See* N.J. CONST. art. I, ¶ 20. The New Jersey Supreme Court has consistently held that this protection is coextensive with the Takings Clause of the Fifth Amendment of the United States Constitution. *See*, *e.g.*, *Englewood Hosp. & Med. Ctr. v. State*, 261 N.J. 195, 338 A.3d 43 (2025); *Littman v. Gimello*, 115 N.J. 154, 557 A.2d 314 (1989). As the New Jersey Supreme Court reaffirmed in the *Englewood Hospital* case, the state constitutional protection tracks federal takings doctrine in all material respects.

The foundational principle that temporary takings are compensable is well established. *See*, *e.g.*, *First Eng. Evangelical Lutheran Church of Glendale v. Los Angeles Cnty., Cal.*, 482 U.S. 304, 107 S. Ct. 2378, 96 L. Ed. 2d 250 (1987). There, the Court held that temporary takings which deny a property owner all use of property are not different in kind from permanent takings, for which the Constitution clearly requires compensation. Critically, the Court held that where the government's activities have already worked a taking of all use of property, no subsequent action by the government—including returning the property—can

relieve it of the duty to provide compensation for the period during which the taking was effective. More recently, the Supreme Court clarified that a property owner has an actionable Fifth Amendment takings claim when the government takes property without paying for it, and the claim accrues at the time of the taking. *See Knick v. Twp. of Scott, Pennsylvania*, 588 U.S. 180 (2019). Defendants cite nothing suggesting that Second Amendment rights would be afforded less protection.

Thus, the temporary seizure of lawfully owned firearms without legal cause can give rise to two distinct but related legal theories: (1) a temporary takings claim under Article I, Paragraph 20 of the New Jersey Constitution or the Fifth Amendment Takings Clause; and (2) a constitutional challenge that survives mootness under the "capable of repetition yet evading review" doctrine. For a temporary taking claim to succeed, the firearm owner must demonstrate a legally cognizable property interest—meaning the firearm must have been lawfully possessed—and that the seizure constituted a taking without just compensation. Where, as here, the taking ended before the matter could be fully litigated, the capable of repetition yet evading review doctrine allows a court to reach the merits of a constitutional challenge to a short-duration firearm seizure even after the firearms have been returned. Especially where, as here, there is a reasonable expectation the same party will face the same action again.

To be sure, in *Chey v. LaBruno*, 608 F. Supp. 3d 161 (D.N.J. 2022), the court held that a firearm owner whose revolver was allegedly induced to be surrendered to police could not maintain a Fifth Amendment takings claim because the firearm had been unlawfully acquired. But that case has no application here because Plaintiffs lawfully owned the firearms in question.

The Supreme Court has articulated a two-prong test, which the Third Circuit has consistently applied: (1) the challenged action must be in its duration too short to be fully litigated prior to cessation or expiration, and (2) there must be a reasonable expectation that the same complaining party will be subject to the same action again. *See Lara v. Comm'r Pennsylvania State Police*, 125 F.4th 428 (3d Cir. 2025); *Hamilton v. Bromley*, 862 F.3d 329 (3d Cir. 2017); *Save Long Beach Island v. U.S. Dep't Com.*, 721 F. Supp. 3d 317 (D.N.J. 2024) The plaintiff must demonstrate there is more than a theoretical possibility of the action occurring against the complaining party again; it must be a reasonable expectation. *Id.*

The capable of repetition yet evading review doctrine has direct application to challenges to temporary firearm seizures in New Jersey. The Third Circuit has already applied this doctrine to a Second Amendment challenge to Pennsylvania statutes that effectively banned 18-to-20-year-olds from carrying firearms during a state of emergency. *See Lara v. Comm'r Pennsylvania State Police*, 125 F.4th 428 (3d Cir. 2025). The *Lara* Court found the doctrine applicable because Pennsylvania

continued to declare emergencies, and it was reasonably likely that other individuals in the same age range would again be banned from carrying firearms. *Id.* The court specifically noted that because emergencies might last for only 21 days under a new constitutional amendment, it was highly unlikely that there would be enough time to fully litigate a Second Amendment claim. *Id.*

This reasoning applies with particular force to New Jersey's temporary ERPO framework. For example, a temporary ERPO under N.J.S.A. 2C:58-23 remains in effect until a court issues a further order, and a hearing for a final ERPO must be held within 10 days of the filing of the petition. *See* N.J. Stat. Ann. 2C:58-24. This 10-day window is plainly too short to fully litigate a constitutional challenge to the order before it either expires or is converted to a final order. Similarly, under the Prevention of Domestic Violence Act, the 45-day period within which the prosecutor must act may be insufficient to complete full constitutional litigation. *See* N.J. Stat. Ann. § 2C:25-21. If the firearms are returned at the end of these periods, under Defendants' argument the case would become moot—but the capable of repetition yet evading review doctrine can preserve the constitutional challenge if the claimant can demonstrate a reasonable expectation of recurrence.[6]

[6] The ALR annotation on federal administrative orders confirms that the doctrine applies where a challenged governmental action would evade full review because the passage of time would prevent any single plaintiff from remaining subject to

Here, both Plaintiffs have viable claims because, without constitutionally valid justification, their lawfully owned firearms were confiscated and they were threatened with cancellation of their firearms permits—even if the confiscation may have only been temporary in Aliaj's case. That confiscation alone, is enough to support Plaintiffs' Second Amendment claims. But, in addition, both Plaintiffs continue to be subject to the various Challenged Policies and Directives that caused the original deprivations. Nothing relevant has changed in their circumstances—they still live in the same municipalities, with the same people, who continue to experience similar life circumstances. Especially since the deprivation experienced by Plaintiffs Aliaj and De La Cruz was based on a misunderstanding, or over reaction, there is no reason to suspect that when similar circumstances arise the local law enforcement would react any differently in enforcing the same department and BCPO rules.

***The Eleventh Amendment Does Not Bar Plaintiffs' Claims***

New Jersey municipalities, counties, enforcement authorities, and prosecutors' offices enforcing state firearms laws do not enjoy Eleventh Amendment immunity in federal court with respect to Second Amendment rights. As discussed in more detail below, this conclusion rests on two independent and well-established legal principles: (1) the Eleventh Amendment has never protected

---

the restriction complained of for the period necessary to complete the lawsuit. *See* 66 A.L.R. Fed. 285 (Originally published in 1984).

municipalities and counties from suit in federal court, as they are not "arms of the state"; and (2) the mere fact that a municipality is carrying out or enforcing state law does not transform it into an arm of the state entitled to immunity. Both the Supreme Court and the Third Circuit have consistently and repeatedly confirmed these principles. The Eleventh Amendment provides that the judicial power of the United States shall not extend to suits against a state by citizens of another state or foreign nationals. The Supreme Court has long interpreted this provision to reflect a broader principle of state sovereign immunity. But the Court has been equally clear that this immunity is personal to the state itself and does not extend to its political subdivisions.

The foundational rule was established shortly after the Civil War, when the Supreme Court held that counties, as corporate entities created by the state with the power to sue and be sued, are separate legal persons from the sovereign state and, therefore, not entitled to share in the state's immunity. *See generally Lincoln Cnty. v. Luning*, 133 U.S. 529, 10 S. Ct. 363, 33 L. Ed. 766 (1890). The Court more recently reaffirmed this principle and framed the central inquiry as whether an entity is "more like a county or city" than "like an arm of the State." *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977). Because the local school board in that case was a political

subdivision with independent powers to issue bonds and levy taxes, the Court held it was not entitled to Eleventh Amendment immunity.

The Supreme Court again confirmed this rule when it stated that the Court has "repeatedly refused to extend sovereign immunity to counties" and that this is true "even when such entities exercise a 'slice of state power.'" *N. Ins. Co. of New York v. Chatham Cnty., Ga.*, 547 U.S. 189, 126 S. Ct. 1689, 164 L. Ed. 2d 367 (2006). Most recently, as Defendants are undoubtedly aware, in a unanimous 2026 decision, the Supreme Court held that NJ Transit Corporation is not an arm of New Jersey. *See Galette v. New Jersey Transit Corp.*, 607 U.S. 509, 146 S. Ct. 854, 224 L. Ed. 2d 322 (2026). In its reasoning, the Court explained that cities and counties are not arms of the state despite, serving public functions and exercising police powers. *Id.* The Court explained that the arm-of-the-state analysis focuses not on whether an entity serves public functions, but on whether the state has chosen to serve those functions through its own apparatus or through a legally separate entity. *Id.*

Further, in *Monell* the Supreme Court further confirmed that municipalities are "persons" subject to suit under 42 U.S.C. § 1983, and that Congress, in enacting that statute, abolished whatever vestige of sovereign immunity municipalities may have possessed. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); *see also* 2 FEDERAL

CIVIL RIGHTS ACTS (3d ed.) § 14:80. As the treatise Federal Civil Rights Acts explains, the Eleventh Amendment jurisprudence of the Supreme Court undercuts municipal liability. *See id.*

The Third Circuit applies a three-factor balancing test to determine whether an entity qualifies as an arm of the state for Eleventh Amendment purposes. *See Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655 (3d Cir. 1989). The three factors are: (1) whether the payment of any judgment would come from the state treasury; (2) what status the entity has under state law; and (3) what degree of autonomy the entity has. *Id.* Each factor being viewed as independent and co-equal. *See*, *e.g.*, *Karns v. Shanahan*, 879 F.3d 504 (3d Cir. 2018).

Applying this framework to New Jersey municipalities, courts have uniformly concluded that they are not arms of the state. *See*, *e.g.*, *Febres v. Camden Bd. of Educ.*, 445 F.3d 227 (3d Cir. 2006). In *Febres*, the Third Circuit held that a New Jersey school board was not an arm of the state entitled to Eleventh Amendment immunity, emphasizing that practical or indirect financial effects of a judgment carry far less weight than the state's formal legal liability for an entity's debts. Similarly, this District's Bankruptcy Court held that New Jersey municipal courts are not arms of the state because they are created and funded by their respective municipalities and are financially independent of the state—even

though other factors (status under state law and autonomy) weighed in favor of immunity. *In re Brown*, 244 B.R. 62 (Bankr. D.N.J. 2000).

The *Lagano* Court stated: "Our resolution of the first question—whether the BCPO is an arm of the State—is guided by *Coleman v. Kaye*, 87 F.3d 1491 (3d Cir. 1996). In *Coleman*, we held that 'when [New Jersey] county prosecutors engage in classic law enforcement and investigative functions, they act as officers of the State.' *Coleman v. Kaye*, 87 F.3d 1491, 1505 (3d Cir. 1996). When county prosecutors perform administrative functions 'unrelated to the duties involved in criminal prosecution,' however, they act as county officials." *Id.* at 1505-06; *see also Murphy v. Middlesex County*, No. Civ. Action No. 15-7102(FLW), 2017 WL 6342154 (D.N.J. Dec. 12, 2017) ("When, however, prosecutors perform administrative functions unrelated to the duties involved in criminal prosecutions, they are not acting as arms of the state but as county officials who remain subject to § 1983 suits. The category of the actions taken, and not their alleged wrongfulness, is determinative.").

With regard to the challenged conduct in this case, the BCPO and Musella were not acting in a prosecutorial capacity, but a mere administrative one. It is unconverted that none of the confiscations at issue were initiated pursuant to any active criminal case or even as part of a criminal investigation. Enacting the

cohabitant gun confiscation policy was an administrative function performed by Musella, rather than a traditional law enforcement function.

More importantly, since 2008 the Supreme Court has made clear that Plaintiffs' Second Amendment rights to possess the firearms in question is "not 'a second class right.'" *See*, *e.g.*, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 70 (2022) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)); *District of Columbia v. Heller*, 554 U.S. 570.

Under Supreme Court jurisprudence, regulations impacting individuals' Second Amendment rights require a historical analogue to pass constitutional muster. *See Bruen*, 597 U.S. at 19 ("*Heller* . . . demands a test rooted in the Second Amendment's text, as informed by history" and "***the government must affirmatively prove that its firearms regulation is part of the historical tradition*** that delimits the outer bounds of the right to keep and bear arms.") (emphasis added) (citing *Heller*, 554 U.S. 570) Here, Defendants have not even attempted to offer a historical analogue to justify the Challenged Policies and Directives that resulting in the taking of Plaintiffs' firearms.

***Defendants Are Amenable To Claims For Declaratory And Injunctive Relief***

It is also well established that the Eleventh Amendment does not bar suits in federal court against state officials sued in their official capacities when a plaintiff seeks prospective injunctive relief to end an ongoing violation of federal or

constitutional law. *See Ex parte Young*, 209 U.S. 123 (1908). If Defendants' argument that state and local governments are not subject to injunctive relief, school segregation would be alive and well in the South. *See Mendez, et al v. Westminster School District of Orange County, et al*, 64 F. Supp. 544, 551 (S.D. Cal. 1946), *aff'd*, 161 F.2d 774 (9th Cir. 1947) (en banc).

This District has consistently applied the *Ex parte Young* doctrine as a narrow but viable exception to Eleventh Amendment sovereign immunity. This District has confirmed that sovereign immunity does not bar § 1983 claims against New Jersey state officials sued in their official capacities for prospective injunctive relief. For example, the *Antonelli* Court recognized that while Congress's passage of 42 U.S.C. § 1983 did not abrogate states' Eleventh Amendment immunity under *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989), sovereign immunity bars only those federal claims that do not fall within the *Ex parte Young* exception for prospective injunctive relief against officials in their official capacities. *See Antonelli v. New Jersey*, 310 F. Supp. 2d 700 (D.N.J. 2004).

Moreover, the Third Circuit has articulated the governing standard: for the *Ex parte Young* exception to apply, there must be both an ongoing violation of federal law and a request for relief that can be properly characterized as prospective. For example, the Third Circuit held that neither requirement was met where a property owner sought to enjoin PennDOT officials from claiming

ownership of easements acquired through a completed condemnation proceeding. *Merritts v. Richards*, 62 F.4th 764 (3d Cir. 2023). The court explained that although earlier actions may have present effects, that does not mean they are ongoing, and that a reparative injunction seeking to restore a plaintiff to a pre-existing entitlement cannot be fairly characterized as prospective. *Id.*

The Supreme Court analysis is straightforward: a court need only determine whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective. *See Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247 (2011). In that case, the Supreme Court held that the *Ex parte Young* exception permitted a suit by a state protection and advocacy organization against state officials, reaffirming the doctrine's continuing vitality.

Here, Plaintiffs seek a prospective injunction preventing their local governments from violating their Second Amendment rights in the same manner as described in the FAC. While Defendants attempt to define this request as retroactive, retroactive relief is of little value to Plaintiffs. As previously stated, nothing has changed since Plaintiffs' firearms were returned—the same policies are still in place, and Plaintiffs still live in the same jurisdictions with the same people—so there is no reason to believe that a similar overreaction or misunderstanding will not occur in the future. So, while a part of what Plaintiffs seek is a declaration that their rights were violated, the far more important relief is

an injunction enjoying BCPO and local law enforcement from violating Plaintiffs' Second Amendment rights in a similar manner in the future.

Thus, assuming *arguendo*, that Defendants are correct on their immunity arguments, Plaintiffs are still entitled to their claims for declaratory and prospective relief.

## CONCLUSION

For the foregoing reasons, Defendants' Motions are without basis. Therefore, Plaintiffs respectfully request that this Court deny each of Defendants' Motions. In the alternative, if this Court finds that the First Amended Complaint is deficient, then Plaintiffs respectfully request leave to file a Second Amended Complaint to address any such deficiencies.

Respectfully submitted,

*/s/ Edward A. Paltzik*
Edward A. Paltzik
TAYLOR DYKEMA PLLC
914 E. 25th Street
Houston, Texas 77009
(516) 526-0341
edward@taylordykema.com

*Attorneys for Defendants*